McMillan *v.* Richards.

---

McMILLAN *v.* RICHARDS *et al.*—PEOPLE *ex rel.* McMILLAN *v.* VISCHER, SHERIFF OF MARIN CO.—McMILLAN *v.* HYATT *et al.*

| | |
|---|---|
| 9 | 365 |
| 80 | 89 |
| 9 | 365 |
| 97 | 205 |
| 9 | 365 |
| 120 | 179 |
| 9 | 365 |
| 122 | 515 |
| 9 | 365 |
| e138 | 392 |
| 138 | 655 |

The settled doctrine of equity now is, that a mortgage is a mere security for a debt, and passes only a chattel interest; that the debt is the principal and the land the incident; that the mortgage constitutes simply a lien or incumbrance; and that the equity of redemption is the real and beneficial estate in the land, which may be sold and conveyed by the mortgagor in any of the ordinary modes of assurance, subject only to the lien of the mortgage.

This equitable doctrine has been adopted in this State, and asserted, directly or indirectly, in repeated instances by this Court.

The mortgage being a mere security for a debt, it must follow, that the payment of the debt, whether before or after default, will operate as an extinguishment of the mortgage.

The original character of mortgages has undergone a change. They have ceased to be conveyances except in form. They are no longer understood as contracts of purchase and sale between the parties, but as transactions by which a loan is made on the one side, and security for its repayment furnished on the other. They pass no estate in the lands, but are mere securities; and default in the payment of the money secured does not change their character.

Proceedings for the foreclosure of mortgages, in the sense in which the terms are used in England, and in several of the States, by which the mortgagor, after default, is called upon to repay the loan by a specified day, or be for ever barred of his equity of redemption, are unknown to our law. The owner of the mortgage in this State can in no case become the owner of the mortgaged premises except by purchase upon sale under judicial decree consummated by conveyance.

A foreclosure suit by our law, results only in a legal ascertainment of the amount due, and a decree directing the sale of the premises, for its satisfaction, the surplus, if any, going to subsequent incumbrancers or the owner of the premises, and execution following for any deficiency.

The statutory right of redemption is equally applicable to sales under decrees in mortgage cases as to sales under ordinary judgments at law.

The estate of a mortgagor and of a judgment-debtor after sale, stand upon the same footing, and the insertion in the decree of a clause foreclosing the equity of redemption, is a useless formula, which cannot enlarge the effect of the decree, or any rights of the mortgagee under it.

The decisions as to the estate of the judgment-debtor after sale become, therefore, authorities for determining the estate of the mortgagor after sale under the decree; and from them it will be found that the estate must remain in the mortgagor until a consummation of the sale by conveyance, as it does in the judgment-debtor, and that the conveyance when executed will take effect, in the one case, from the date of the mortgage, as it does in the other from the time the lien of the judgment attached.

24

McMillan v. Richards.

It follows, that a creditor of the mortgagor obtaining a judgment after sale under the decree of foreclosure, but before the execution of the conveyance thereunder, acquires a lien on the estate entitling him to redeem.

Such lien and right to redeem would be lost, where a prior judgment had been obtained by a third party against the mortgagor, under which his estate subject to the mortgage had been sold, and the time for redemption had elapsed, and a conveyance had been executed.

The legal estate exists in the judgment-debtor after expiration of the time to redeem, until execution of the conveyance to the purchaser.

The purchaser at an execution-sale, before conveyance to him, has a right to redeem the property sold on the enforcement of a prior lien; after conveyance to him he has the same right as successor in interest to the debtor or mortgagor.

A redemption of property sold under a decree of foreclosure is accomplished, by payment, under protest, of the amount claimed to be due by the sheriff, though certain portions claimed are disputed.

The object of a protest is to take from the payment its voluntary character, and thus conserve to the party a right of action to recover back the money. It is available only in cases of payment under duress or coercion, or when undue advantage is taken of the party's situation. It has no application to voluntary payments. It does not create a lien upon the money paid, or any legal impediment to its control. It does not impair, in any respect, the operative effect of the payment as a discharge of the demand upon which it is made, so far as such demand is legal. It is notice, only, to the party receiving the payment, that, if the demand is illegal in whole, or in any specified particulars, he may be subjected to an action for the recovery back of the amount to which objection is made; and if action be brought, the protest is only available as evidence of the fact of compulsion.

Nor will the subsequent institution of suits by attachment and injunction to obtain and secure the repayment of the amount alleged to have been overpaid in the redemption, destroy the operative effect of the payment as a redemption.

Where money has been placed on general deposit in a bank, and negotiable certificates of deposit have been issued to the depositor for the amount, there is nothing left in the possession of the bankers belonging to the depositor, upon which an attachment issued against his property can fasten. The bankers, by their certificates, become liable, not to refund to the depositor the specific money deposited, but to pay its amount to the holder of the certificates, whoever he may be, on their presentation.

Where money is paid upon compulsion, the law raises an obligation to refund, and the form of the action is for money had and received to the plaintiffs' use. The words "had and received to the plaintiffs' use," are put as the consideration upon which to support the assumpsit on the part of the defendant.

Proceedings for a mandamus to compel the execution of a sheriff's deed to a redemptioner, after sixty days from the redemption, under section 232 of the Practice Act, can be commenced in the county where the relator resides; the provision of the statute that actions against a public officer for acts done by him in virtue of his office, shall be tried in the county where the cause or some part thereof arose, applies only to affirmative acts of the officer, by which, in the execution of process or otherwise, he interferes with the property or rights of third persons, and not to mere omissions or neglect of official duty.

The proceeding does not involve the determination of a right or interest in real estate. The relator claims only an official document, the possession of which will enable him to assert any rights he may have acquired. The awarding of the mandamus can not determine these rights, or in any respect affect the interests of third parties.

APPEALS from the District Courts of the Seventh and Twelfth Judicial Districts, Counties of Marin and San Francisco.

These three cases were argued together, as they all grew out of the same transaction. The first of the actions was ejectment, brought by plaintiff against defendants, to recover a tract of land in Marin county, tried before the District Court without a jury. The Court rendered a decision in favor of defendants, against

plaintiff, whereon judgment was entered. The plaintiff appealed from the judgment, upon the facts as found by the District Court, by which it appeared as follows :

Both parties claimed to derive title to the premises from Antonio M. Osio. On the fifth day of December, 1851, Osio was indebted to George W. Bird, by a promissory note, made by Osio, payable to Bird, bearing interest at five per cent. per month.

To secure the payment of this note, with interest, Osio mortgaged to Bird the premises in controversy. Bird assigned the note and mortgage to Jonathan Edwards, and Edwards assigned them to Thomas G. Cary. The mortgage and the assignments were duly recorded in the office of the county recorder of Marin county.

After the note and mortgage were executed and delivered, and before the foreclosure of the mortgage, Osio sold and conveyed the premises mortgaged to Andrew Randall. In September, 1853, Cary commenced an action for the recovery of the amount due on said note, and to foreclose the mortgage. Osio and Randall were the parties defendants in such action. On the fourth of December, 1854, it was ascertained and adjudged that there was due on the note $8,400, and $295 costs, and a decree was then entered for the sale of the premises, and the application of the proceeds of the sale to the payment of the amount found due. The decree contained a clause barring and foreclosing the equity of redemption of said Osio and Randall, and all persons claiming by, through, or under them, or either of them, in and to said mortgaged premises, subsequent to the commencement of the action. From this judgment and decree, Randall appealed to the Supreme Court. At the April Term, 1856, the appeal was dismissed, with twenty per cent. damages.

On the fourteenth of June, 1856, the premises were sold as directed by the decree, and purchased by said Cary, for $16,000, leaving due him a balance on the judgment. On November 18, 1854, Jesse Smith recovered a judgment in the District Court of the Fourth District against said Randall. A transcript of the docket of this judgment, duly authenticated, was filed in the recorder's office of Marin county, on the twentieth of February, 1855. Execution was issued on the Smith judgment, and on the twelfth of March, 1855, Randall's interest in the premises was sold to the defendant Richards for $2,000, and certificates of sale issued. On the ninth of February, 1856, no one having redeemed, the sheriff executed a conveyance to Richards.

On the thirtieth day of January, 1855, McMillan recovered a judgment against Randall in the Fourth District Court, a transcript of the docket of which was filed in the recorder's office of Marin county, on the seventh day of February, 1855.

On the twenty-first of July, 1855, McMillan recovered another judgment against Randall in the Twelfth Judicial District Court,

a transcript of which was immediately thereafter filed in the same recorder's office.

On the twelfth of January, 1856, an execution was issued on the first of McMillan's judgments, and the interest of said Randall in said premises was sold on such execution, on the seventeenth of March, 1856, to McMillan, for $2,000, and a certificate of sale issued ; and no one having redeemed, the sheriff, on the twenty-sixth of December, 1856, executed a deed to McMillan.

On the twelfth of December, 1856, McMillan, with his attorney, Mr. Shafter, presented himself before the sheriff of Marin county, claiming to redeem the premises, from the sale made under the said decree of foreclosure, by virtue of his judgments against Randall, which he claimed were liens on the property; and requested the sheriff to make up the amount necessary to redeem; at the same time serving upon the sheriff a notice of redemption, accompanied with his affidavit of the amount due upon said judgments, and duly certified copies of their dockets. After some objection, the sheriff consented to make up the amount; and on the day following, when called on again, he reported the amount at $24,146 08.   What then took place is thus stated in the testimony of the sheriff on the trial :

" Mr. Shafter said that was too much; that the amount required would not amount to seventeen thousand dollars, but he would pay whatever sum I demanded, and insisted 1 should name the amount.   He paid me the amount, twenty-four thousand one hundred and forty-six dollars and eight cents; he protested against paying the amount; said it was too much; it was at the same time, in the office; he requested me to give a statement of the items, as I figured it up; there was a written protest served at the time Shafter asked me for the certificate; I think he prepared the certificate; I signed it; Shafter told me probably that was not the end of the matter, and requested me to deposit at Garrison & Co.'s, to save the interest during the litigation. About one week after, I deposited a portion with Tallant & Wilde, and a portion with Parrott & Co.   *   *   I mean by protest, only that he said the sum was too much.   The written protest was after I had counted the money, and found it correct. I read the certificate and signed it; can't say whether certificate was executed before protest or after.   *   *   I knew it to be correct.   I selected my own bankers; Shafter advised me as to Parrott.   There was no arrangement about the money.   Shafter said a portion of the money was borrowed of Garrison & Co."

The written notice of protest, referred to in the testimony of the sheriff, specified the items to which objection was made. After the payment as described above, and at the same interview, the plaintiff requested the sheriff to deposit the money with Messrs. Garrison & Co., bankers at San Francisco, assigning as a reason that a part of the same had been loaned by them

at two per cent. a month, and would probably be tied up by liti-
gation for several months, and by such deposit the interest could
be provided for.　On the twentieth of December, the sheriff pro-
ceeded to San Francisco, from Marin county, and deposited a
portion of the money with Tallant & Wilde, and a portion with
Parrott & Co., receiving certificates of deposit for the same.

McMillan, whilst the sheriff was in San Francisco, commenced
an action in the District Court of the Twelfth District, against
him, for the recovery of $10,000, as for money had and received
by the sheriff, to and for the use of McMillan, and according to
the finding of the Court, " caused the money so deposited to be
attached in the hands of the bankers to satisfy any judgment
which he might recover in the action," and which " money re-
mained so attached at the commencement and trial" of this
action.

On the 17th of February, 1857, McMillan, as plaintiff, com-
menced an action on the equity side of the Court, against John
G. Hyatt, (the assignee of the certificate of sale, executed to said
Cary, and the assignee also of the balance due by the decree after
the sale on the foreclosure,) and against the sheriff Vischer, and the
bankers with whom he had deposited the money, and others, as
defendants; and in such action the plaintiff sued out an injunc-
tion enjoining said Vischer from negotiating, or transferring, or
in anywise disposing of said certificates of deposit, and enjoining
the said bankers from paying the certificates of deposit.　McMil-
lan claimed, and stated by his complaint in such action, verified
by his oath, that the sum of $6,700, paid to the sheriff, was not
due and payable as a portion necessary for the redemption afore-
said, and that the sheriff had no right to have the same; and
prayed that a receiver might be appointed to take the custody of
the said certificates of deposit, for the purposes of that suit, and to
invest the funds pending the litigation—that an account might be
taken of the money paid under protest, and that the excess over
and above the true amount essential in law to effect a redemp-
tion might be decreed to be paid to the plaintiff, with all interest
accruing thereon.　To the complaint a demurrer was filed and
sustained.

The Court found as a fact that of the sum of $24,146 08, paid
to the sheriff, only the sum of $17,606 87 operated as a legal pay-
ment for the purpose of the redemption, and that the same was
insufficient therefor.

On the 19th day of January, 1857, the said sheriff of Marin
county executed his deed of the premises to John G. Hyatt, in
virtue of said sale under said decree.　The defendants claimed
under this deed, and were in possession of the premises at the
commencement of the action.

The case of The People ex rel. McMillan v. Vischer, sheriff,
etc., was a proceeding by *mandamus* instituted in the Twelfth

District Court to compel Vischer, as sheriff, to execute a deed of the same premises to the relator, to which he alleged himself entitled by virtue of his redemption.

The facts in the three cases sufficiently appear in the above statement, and in the opinion of the Court.

*Heydenfeldt & Shafter* for Appellant, in the ejectment-suit.

The general question is, whether the facts found support the judgment.

The title of the plaintiff depends upon the validity of the redemption of December 13, 1856.

To the validity of the redemption it is essential that Hyatt should have had a redeemable interest; that McMillan should have been a redemptioner; that an amount of money sufficient to effect the redemption, should have been paid to a party authorized to receive it for that purpose; and, that such payment should have been made within the time limited by law.

1. Hyatt had a redeemable interest.

The decree was in ordinary form, and Hyatt's interest was that of an assignee of the certificate given to the purchaser at the sale on the Cary decree, June 14th, 1856. Practice Act, § 229.

2. McMillan was a redemptioner.

To this position, however, the following objections are taken:

First objection.—Randall, the debtor in McMillan's judgment, had merely an equity of redemption in the land, and an equity of redemption cannot be subjected to the lien of a judgment.

This objection, however tenable at common law, is of no avail under our system. Practice Act, § 260; Kent *v.* Laffan, 2 Cal. Rep., 295; Godeffroy *v.* Caldwell, 2 Cal. Rep., 492; Johnson *v.* Dopkins, 3 Cal. Rep., 391; Middleton *v.* Guy, 5 Cal. Rep.; Harlan *v.* Smith, 6 Cal. Rep.; Waters *v.* Stewart, 1 Caine's Cases, 65; 4 Johns., 40; 6 Johns., 290.

If the law was otherwise, then by the device of mortgaging his land for a small sum, a debtor might put his estate beyond the reach of his creditors.

Second objection.—But admitting that an equity of redemption may be the subject-matter of a judgment lien, still McMillan's judgment was not a lien on the particular equity of redemption in question.

Under this head we have the following specifications:

1. The transcript of the large judgment of McMillan was not filed in Marin county (Feb. 7, 1855,) until after the Cary decree, (Dec. 4, 1854,) and that decree foreclosed or ended the title of Randall the moment it was entered.

Answer.—Assuming the correctness of this view, then when Cary comes to sell, June 14, 1856, he is put in the position of a

creditor selling his own estate for the payment of his debt, which is absurd.

The foreclosure was not effected by the decree. That consummation could be wrought out only by the decree, the sale in pursuance of it, the lapse of time, and a sheriff's deed. Van Rensselaer *v.* Sheriff, 1 Cow., 502; Pollard *v.* Taylor, 13 Alabama R., 604.

2. McMillan had no judgment-lien, for he became the purchaser at his own sale, March 17, 1856.

Answer.—His judgment amounted to $21,000, his bid $2,000, and his judgment continued to be a lien for the balance. Prac. Act, § 231; Vandyke *v.* Herman, 3 Cal., 295.

The cases cited by the respondents, 8 Johns., 332; 1 Hill, 110; 4 Cow., 133, are of no avail, for they all proceed upon a positive provision of the New York statute, and the point in Vandyke's case is not presented in any of them.

See the opinion of the Court in Ex parte Paddock, 4 Hill, 544.

In the discussions at the bar, the counsel of the respondents disclaimed all intention of disputing the correctness of the decision in Vandyke *v.* Herman.

In any event, the decision should be adhered to until the rule shall be changed by the Legislature.

For an exposition of the rule *stare decisis,* see 2 Green. Cruise, p. 543, note.

3. But conceding that McMillan had a continuing lien for his balance, the counsel for the respondents insist that he could not use that lien as the basis of redemption.

The statute (Prac. Act, § 230,) goes upon a *status.*

He who has a "lien" "may redeem" by force of it. Vandyke's case establishes a lien in McMillan, and the statute provides that he might put it to the particular use in question. The two things cannot be disassociated, for they are joined together by positive enactment.

4. McMillan had no lien, for by his purchase and the lapse of the six months he became the owner of the land.

Answer.—The objection does not go to the right of redemption, but to the particular capacity in which McMillan undertook to exercise the right.

But McMillan did not become the owner of the land on the grounds named. At the date of his redemption, (Dec. 13, 1856,) he had not taken a deed from the sheriff. Van Rensselaer *v.* Sheriff, 1 Cow., 502; Ex parte Peru Iron Company, 7 Cow., 540; Bissell *v.* Payn, 20 Johns., 3; Smith *v.* Colvin, 17 Barb., 157; Comp. Stats., 513, § 1.

This view is fully justified by the common law of forfeiture. The party in whose favor the forfeiture had accrued was always at liberty to claim it or waive it in his election. And his intention to claim the forfeited right was required to be manifested by

appropriate conduct.    If a grantor claimed an estate on the
ground of a breach of condition, if a landlord would end a term
for non-payment of rent, entry or re-entry was essential; and
forfeited franchises did not return to the sovereign until after
there had been a judgment of forfeiture procured at his in-
stance.

3. A sum of money was paid to the party entitled to receive
it, and sufficient in amount to effect the redemption.

It appears distinctly, from the record, that McMillan "paid"
the sheriff, on the 13th of December, $24,146 08, but under "pro-
test that it was too much."

It appears that the sheriff was requested to deposit the money
with Garrison & Co., but it is further found that the sheriff re-
fused to comply with the request, and the request was not made
until after payment was made.

It is found that there was no arrangement about the money
between the sheriff and McMillan, or any one representing him.

And it is found as a fact, that the sheriff "selected his own
bankers."

In view of these findings the respondents are not at liberty to
argue that the payment, after all, was "conditional," or that the
money was left on "deposit," or that the sheriff received the
money, not as sheriff, but under an "agency" or "employment,"
for all these hypotheses are in conflict with the findings that the
money was "paid," and without any "arrangement."  Vischer
could not have received the money as McMillan's agent, except
under an arrangement to that effect, nor could the money have
been paid to him on condition, unless there had been an arrange-
ment raising the condition.

Nor are the respondents at liberty to argue that McMillan did
not "intend" to pay.    The question of *intention* was an open one at
the trial, and was, it is to be presumed, fully investigated by the
Court, in the light of all the facts and circumstances raising pre-
sumptions on the point.    The subsequent garnishment and in-
junction had to do with this question of fact, and it is to be pre-
sumed that all due weight was allowed them.    But on all the
proofs, the Court has found that the money was "paid under pro-
test," and "without any arrangement."    This is, in effect, a find-
ing that the party intended to pay under protest—that is, that
he intended to do what he did in fact—and the respondents are
not at liberty to allege that McMillan did not intend to pay it at
all or in any sense.

There are four questions, however, fairly presented by the
record in this connection: the effect of the protest upon the pay-
ment; the effect of the garnishment upon it; the effect of the
injunction, and the effect of the sheriff's deed to McMillan, De-
cember 26, 1856.

As to the protest. It did not affect the validity of the payment.

The only purpose of protest in any case, is to rescue the payment from the imputation of being voluntary, and beyond that it has, and can have no effect whatever.

There is no case in England or America, in which the position has ever been taken, that a protest vitiates the payment. In fact "protest" is a term unknown to the common law. The point that a protest avoids a payment is made here for the first time.

In 2 Sand. Superior Court Reps., 481, Fleetwood v. City, it was held that "the legal effect of the payment was not impaired by the protest made."

In Ex parte Newall, 4 Hill, 589, the redemptioner did not confine himself to a verbal or written protest even, but resorted to the extreme measure of injunction, and still without prejudice to the payment.

But it is insisted by the respondents that if the payment is allowed to stand as such, when made under protest, it would operate as an extension of the time within which the party is to ascertain the amount due, and in which to pay it absolutely.

Now, we admit that the payment must be made within the six months, and we further admit that the payment must be absolute, that is, it must not be a conditional payment, but we deny that protest makes a payment conditional, or in any manner detracts from its absoluteness, in so far as the payment is made necessarily. Its only purpose and effect is to conserve to the party the right of recovering back the excess. The action of the protest is confined to the excess. It is limited to that as its subject-matter. Then, as all but the excess is paid absolutely, as it is gone without the possibility of recall, there is no occasion for an extension of the time of payment, and, indeed, such extension is impossible. The time for doing an act cannot be extended after the act has once been done.

The objection in question might have been urged in 4 Hill, 589, as well as here, and it is directly opposed to the case in 2 Sand, 481, and is founded in an entire misapprehension of the purpose and effect of a protest.

As to the garnishment. It did not impair the payment by legal effect. It was not a recaption of the money. The action was money had and received. It counted upon an indebtedness—went upon the relation of creditor and debtor, and not upon an allegation that McMillan had a present property interest in any money specifically sued for—the money "had and received," was put merely as the consideration on which to raise an *assumpsit* on the part of Vischer. The garnishment involves no assertion of title, for in the theory of garnishment, the funds garnisheed are regarded as the property of the debtor in the

hands of third persons. The garnishment was not a recaption, for prior to the attachment, and now, the funds are in the custody of the law.

But an effect which has been denied to an injunction cannot be claimed for a mere garnishment. 4 Hill, 589.

As to the injunction. The payment having once been accomplished, its effect was not impaired by the subsequent injunction. This was the exact question made and decided in Ex parte Newall. 4 Hill, 589.

The effect of the deed to McMillan, December 26, 1856. The counsel for respondents insist that the deed in question operated as an abandonment or waiver of the redemption.

Answer.—After redemption from the Cary sale and lien, McMillan had a clear, unmistakable statute right to a deed in pursuance of his purchase, and the objection involves the absurdity of asserting that the exercise of the right involves a surrender of the very ground upon which the right was claimed, and generally that an effectual way to abandon land is to procure a deed of it. The novelty of this doctrine is equalled only by its profundity.

In the discussion in the Court below, it was insisted by the respondents, that the redemption was made after the expiration of the six months—contending for lunar instead of calendar months. This objection, however, was not presented in the discussion at the bar here, and we suppose that counsel have abandoned it. If they revive it in the brief they have procured permission to file, then we cite in answer : Parsons v. Chamberlin, 4 Wend., 512; Snyder v. Warren, 2 Cow., 518 ; Moulton v. Mayor, 10 Wend., 395.

The reasoning of these cases when applied to our statute, shows that calendar months were intended. Practice Act, §§ 232, 231.

Again : The revenue acts, so far as they relate to sales of land, are in pari materia. See Acts of 1850, p. 40, § 47 ; Acts of 1851, p. 159, § 41; Acts of 1853, p. 699, § 33 ; Acts of 1854, p. 110, § 90.

Again : By the reasoning adverted to, the calendar signification must be given to the term as used in the Constitution. Art. IV, § 5; Art. II, § 1.

In Pennsylvania, South Carolina, Virginia, Massachusetts, Maine, Vermont, Connecticut, Alabama, and Kentucky, the term " month " in a statute, is held to mean a calendar month.

In the other States, it does not appear, from the reports, what the rule is, so far as we have had an opportunity of examining them.

4. Admitting that Hyatt had a redeemable interest—that McMillan was a redemptioner—that he redeemed, and in time—the respondents further insist that McMillan cannot maintain this action, for the reason that he has no sufficient deed.

McMillan v. Richards.

The deed of December 26, 1856, was given to McMillan in his capacity of purchaser at his own sale, March 17, 1857—and its effect was to pass to the plaintiff the title of Randall. This was sufficient for the purposes of this action. Another deed, given after the lapse of sixty days, and as consequent upon the redemption, howsoever desirable as a further assurance, could not operate to transmit any title not already vested in McMillan, by the deed of December 26.

Nor does the sheriff's deed to Hyatt, given on the nineteenth of January, 1857, impair, in the slightest degree, the effect of the deed to plaintiff, of December 26.

Assuming the validity of McMillan's redemption, the sheriff had no power to give a deed to Hyatt. The sheriff is a mere ministerial officer, and after McMillan's redemption, any deed given by him to any other person than the one who had the legal right to it would be null and void, not only on the ground of excess of power, but also on the ground of fraud, and no proceeding instituted for the purpose of setting it aside, would be necessary.   1 Denio, 272, Ex parte Raymond.

In this case the sheriff was decreed to give a deed, notwithstanding another was outstanding in the hands of a third person. Dickenson v. Gilliland, 1 Cow., 481, 489 ; Practice Act, § 232.

5. As to the Smith judgment and sale, it is apparent that they present no objection to the plaintiff's right—and on that respondents have made no point. Though the Smith judgment was older than McMillan's, still McMillan's judgment was recorded in Marin county (February 7, 1855) before the levy and sale on the Smith judgment (March 12, 1855.) This last judgment was never recorded in Marin county at all.

6. The facts are all found, including the damages for the detention of the premises, and if the judgment should be reversed, it is submitted that a final judgment may be directed by this Court for the plaintiff.

*John Currey* for Respondents, in the ejectment-suit.

1. The mortgage, executed by Osio, and the foreclosure thereof, vested in Cary the legal title in the land mortgaged.

By the common law of England, upon the execution of a mortgage-deed of the freehold and inheritance, the legal estate in the land mortgaged became vested in the mortgagee, subject to be divested by the payment, at the day appointed, of the money, to secure which the mortgage was made. If the condition by which the mortgagee was to become divested of the title, was not strictly performed, his estate then became absolute and indefeasible.   Jickling's Analogy between Legal and Equitable Estates, pp. 60, 70 ; Coventry's Notes to Powell on Mort., p. 269 ; Black. Com., 157, 158.

In view of the severe consequences of default on the part of

the mortgagor, resulting in the entire loss of his estate, Courts of Equity became induced to interfere to mitigate the rigor of a legal forfeiture. " They did not," says an elementary writer, " make the attempt of altering the legal effect of the forfeiture at common law; they could not, as they might have wished, in conformity with the principles of the civil law, declare that the conveyance should, notwithstanding forfeiture committed, cease at any time before sentence of foreclosure, on payment of the mortgage-money; but, leaving the forfeiture to its legal consequences, they operated on the conscience of the mortgagee, and acting *in personam* and not *in rem*, they declared it unreasonable that he should retain for his own benefit what was intended as a mere pledge; and they adjudged that the breach of the condition was in the nature of a penalty, which ought to be relieved against, and that the mortgagor had an equity to redeem on payment of principal, interest, and costs, notwithstanding the forfeiture at law." Coote on Mort., p 10. And these Courts, proceeding upon the principle of relieving against a forfeiture, the effect of which was admitted to be to invest the mortgagee with the absolute estate, and acting *in personam* and not *in rem*, allowed the debtor to redeem the estate lost, by paying, within a reasonable time, the mortgage-money, interest, and costs; upon which he was entitled to call on the creditor for a re-conveyance of the estate. 2 Cruise Dig., tit. 85, ch. 1; 2 Story's Eq. Jur., §§ 1012, 1013, 1014; Willard's Eq. Jur., 426, 427. This right acquired the name of an equity of redemption, and was not, until a comparatively recent period, says Judge Story, settled to be anything more than the mere right to reduce the estate back into the possession of the mortgagor by the payment of the debt, or other discharge of the condition. " But it is now firmly established," says this commentator, " that the mortgagor has an estate in the land, in equity, in the nature of a trust-estate." 2 Story's Eq. Jur., § 1015; Willard's Eq Jur., 427, 428.

Equity jurists do not pretend that the legal title, after mortgage-in-fee, remains in the mortgagor. Conrad v. Atlantic Insurance Co., 1 Pet. R., 441. Judge Story, after speaking of the growth of the chancery jurisdiction, in respect to this subject, says, triumphantly: " But it is now firmly established that the mortgagor has an estate in the land, in equity, in the nature of a trust-estate."

Chancellor Kent says: " The legal ownership is vested in the creditor : but, in equity, the mortgagor remains the actual owner until he is debarred by his own default or by judicial decree." 4 Kent, 133. Again he says: " Upon the execution of the mortgage, the legal estate vests in the mortgagee, subject to be defeated upon performance of the condition." Ib., 154.

Until the time of Lord Hardwicke, an equity of redemption was regarded as a mere right, and not an inheritance that could

be entailed within the statute of *de donis*. Roscarrick *v.* Barton, 1 Ch. Cas., 217; but in the case of Casborne *v.* Scarfe, 1 Atk., 602, heard before Lord Hardwicke, he declared the equity to be an estate in the land until debarred of it by decree of foreclosure.

The equity of redemption having, under the fostering care of Courts of Equity, grown into an estate in the land mortgaged, depends upon the same jurisdiction for its recognition and beneficial existence.

The superiority and paramount character of the mortgagee's estate at law is demonstrated in the fact, that, unless restrained by agreement or positive law, "he may, when he pleases, and before default, put the mortgagor out of possession by ejectment or other proper suit. This is the English doctrine, and it prevails very extensively in the United States." 4 Kent's Com., 155; Birch *v.* Wright, 1 T. R., 378; Rockwell *v.* Bradley, 2 Ct., 1; Blaney *v.* Bearce, 2 Greenl., 132; 2 Mass, 493; Newell *v.* Wright, 3 ibid., 138; Colman *v.* Packard, 16 ibid., 39; Simpson *v.* Ammons, 1 Binney, 176; McCall *v.* Lenox, 9 Serg. & Rawle, 302; Jackson *v.* Langhead, 2 Johns., 75; Jackson *v.* Fuller, 4 ib., 215; Jackson *v.* Hull, 10 ib., 480; Jackson *v.* Hopkins, 18 ib., 487; Doe *v.* Grimes, 7 Blackf., 1; Doe *v.* Mace, 7 ib., 3.

In Birch *v.* Wright, 1 Tenn., 383, the point was adjudged directly, and the Court said: "The mortgagee has the right to the actual possession whenever he pleases; he may bring his ejectment at any moment that he will, and he is entitled to the estate as it is, with all the crops on it."

In Doe *v.* Grimes, 7 Blackf., p. 1, which was an action of ejectment by the mortgagee against the mortgagor, commenced before default on the part of the mortgagor, the only question was whether the action could be maintained before default, where the mortgage was silent as to the possession. The Court held that it could: and, among other things, said: "Courts of Equity also acknowledge the right of the mortgagee to the possession, and will not, it seems, interfere to prevent him from pursuing his legal remedy." Cholmondelay *v.* Clinton, 2 Merivale, 359; Williams *v.* Medlicot, 6 Price, 495.

The case of Doe ex dem. Brown *v.* Mace, 7 Blackford R., 3, was an action of ejectment by the heirs of Thomas B. Brown, deceased, who was the mortgagee of the premises; the defendants were the mortgagors, and others holding under them. The Court said: "The legal title being in the mortgagee at the time of his death, it descended to his heirs, who hold the possession and receive the rents and profits as trustees for the administrators." The Court further said: "The remaining question is, whether a mortgagee can dispossess the mortgagor and those holding under him, without a demand of possession or notice to quit. * * * Formerly a mortgagor in possession was regarded

McMillan v. Richards.

in the light of a tenant-at-will to the mortgagee, (Powsley v. Blackman, Cro. Jac., 659,) upon which was predicated the opinion that a notice to quit was necessary before he could be dispossess-. ed. That view is now exploded, and it is generally acknowl- edged, at this day, that no such relation exists between them. He is not entitled to the emblements, nor does he hold, paying rent; he is in possession by sufferance, merely, of the mortgagee, and is, therefore, not entitled to notice to quit before ejectment may be brought against him. The English authorities, since the days of Lord Mansfield, are uniform on this point. Keech v. Hall, Doug. R., 21; Birch v. Wright, 1 Tenn. R, 378; Doe ex dem. ·Fisher v. Giles et al., 5 Bing., 421; Doe ex dem. Roby v. Maisey, 8 B. & C., 767. In the United States there is some contrariety in the decisions, but the weight of them is in accordance with the English authorities."

See also Phyfe v. Riley, 15 Wend., 253; McMahan v. Kimball, 3 Blackf., 1–13; and Keech v. Hall, and Notes by Hare & Wal- lace, 1 Smith's Lead. Cases, 487.

The law concerning estates in dower, as it exists at common law, affords another illustration of the doctrine here maintained. To entitle a widow to dower, three circumstances must needs concur: 1, a legal marriage; 2, seizin of the husband; and 3, the death of the husband. The seizin of the husband, requisite as the foundation for the widow's title to dower, must be more than an equitable seizin—it must be a legal seizin of the estate of inheritance. Upon this principle of requiring a legal seizin in the husband, says Jickling, at page 141 of the book before mentioned, " If at the celebration of the marriage the estate be subject to a mortgage-in-fee, and continue so subject until the death of the husband, the widow will not be entitled to her dower, though it would be otherwise if the mortgage were for a term of years; as in the latter instance, the husband still continues ·seized of the freehold and inheritance." D'Arcy v. Blake, 2 Sch. & Lef., 388; 4 Kent, 43–44.

In the case of Stelle v. Carroll, 12 Peters' R., 204, Chief Justice Taney declared that " according to the principles of the common law, a widow is not dowable in her husband's equity of redemp- tion; and if a man mortgages in fee, before marriage, and dies without redeeming the mortgage, his widow is not entitled to dower." Though the mortgagor may remain or be in possession, this rule is not thereby changed. He cannot disseize his mort- gagee, because, as was distinctly held in Cholmondelay v. Clin- ton, and Birch v. Wright, the possession of the mortgagor is the possession of the mortgagee. See McMahan v. Kimball, 3 Blackf. R., 10.

On the execution of the mortgage, the mortgagor becomes the equitable owner, the mortgagee the legal owner of the land, in which respective situations they remain until the land is redeem-

ed or foreclosed; this seems to be the modern doctrine in relation to the qualities of the estates of mortgagor and mortgagee. Coote on Mort., 319.

The respective estates of mortgagor and mortgagee having thus been noticed, it becomes important to consider, in the next place—

What is the effect of a decree of foreclosure or judicial sentence barring the equity of redemption, or equitable estate of the mortgagor?

As preliminary to the subject-matter of this inquiry, it may be observed that the principle of substantial justice, which induced Courts of Equity to interfere on behalf of a mortgagor who had forfeited his estate, and to relieve him from the consequences of his neglect to perform the condition by which he was to be reinvested with his former estate in the land, led to the establishment of rules by which the mortgagee might compel the mortgagor to repay the money borrowed, with interest, or, in default thereof, to be forever foreclosed from redeeming the estate; that is, barred and utterly excluded his equity of redemption therein, without possibility of recall. 2 Black. Com., 159; 3 Powell on Mortgages, 961.

This doctrine, upon the principle *ex equo et bono*, grew into existence, *ex necessitate*, as a consequence of the exercise of a jurisdiction which recognized and gave effective existence to the equity of redemption, as an equitable estate in the mortgagor. 1 Powell on Mortgages, 335.

The operative force and effect of a judicial foreclosure is all that is necessary to be examined in this place; and, if the language of elementary writers and of jurists on the subject is to be understood in its natural import, there can be no difficulty in arriving at a definite conclusion in relation thereto.

Mr. Coote says: "By the civil law, the debtor might redeem the estate on payment of his debt, at any time before sentence passed." Coote on Mort., 10. "Until debarred by judicial sentence." Ibid., 209. "Until decree of foreclosure." Ibid. "The mortgagor is the equitable owner until the land is redeemed or foreclosed." Ibid., 319.

"Both at law and in equity," says Mr. Jickling, "the conveyance is at first conditional, not absolute; and in both, the estate may, on an event, be discharged of the condition, and become the indefeasible property of the mortgagee. At law, that event is the non-payment at the day agreed upon; in equity, it is the decree of a Court of judicature. In the former jurisdiction, it is conventional; in the latter, judicial." Jickling's Analogy, 66.

Chancellor Kent, in his definition of a mortgage, states that "the legal ownership (of the land mortgaged) is vested in the creditor; but in equity, the mortgagor remains the owner until he is debarred by his own default, or by judicial decree." 4

Kent., 133. And again : " The equity doctrine is, that the mort-
gage is a mere security for the debt, and only a chattel interest,
and that until decree of foreclosure, the mortgagor continues the
real owner of the fee." Ibid., pp. 159, 160.

" Foreclosure," says Hilliard, " is the process by which a mort-
gagee acquires an absolute title to the property of which he had
previously been only the conditional owner, or upon which he
had previously a mere lien or incumbrance." 2 Hilliard on
Mort., 1, 1st ed.

Whenever the decree is pronounced, the event which fixes
limit to the mortgagor's equitable estate has happened ; and to
say the mortgagor may redeem after " sentence passed," or after
he is " debarred by judicial decree," or " decree of foreclosure,"
is in contradiction of, and directly repugnant to language so ex-
plicit and entirely unambiguous, as to preclude the possibility of
successful cavil.           o

But upon the effect of a decree of foreclosure, *eo instan* i, upon
the equity of redemption or equitable estate of the mor ̣̣agor,
we are not without express authority, as will presently a ̣ear.

The estate of the mortgagor, which, after condition brok ̣a, is
a mere equitable estate, as between mortgagor and mortgagee,
can be protected and enforced only in a Court of Equity. This
estate depends for its vitality upon the power that nurtured it
into existence ; and, to attempt to prove, proceeding upon ele-
mentary principles, that after forfeiture or default, the mortga-
gor had an estate at law in the mortgaged land, would of neces-
sity result in *reductio ad absurdum.*

The English practice of a strict foreclosure of the equity of re-
demption, whereby the creditor takes the estate to himself, in-
stead of having it sold and the proceeds applied, seems to be
provided against by our statute, (Practice Act, §§ 246, 247, 248,
260,) and instead thereof, we have the practice that prevails at
this day, to some extent, in England, of obtaining a decree for
the sale of the mortgaged premises by an officer of the Court,
and for the application of the proceeds of the sale to the dis-
charge of the mortgage-debt. But, though the decree may di-
rect a sale of the mortgaged premises for the payment of the
debt secured, still the effect of such decree is not to postpone
the foreclosure as a bar and extinguishment of the equity of re-
demption.

Mr. Coventry, in his Notes to Powell on Mortgage, says : " It
may be proper to mention here, that foreclosures in Ireland are
effected by means of a decree for sale. The equity of redemp-
tion stands for ever foreclosed, but the estate is directed to be sold,
and the mortgagee paid his principal, interest, and costs, and the
surplus returned to the mortgagor, his executors or administra-
tors." 3 Powell on Mort., 963.

The English practice adverted to, of decreeing a sale of the

McMillan v. Richards.

mortgaged land, etc., received the approbation of Chancellor Kent, who said the same practice prevailed in New York, Maryland, Virginia, South Carolina, Tennessee, Kentucky, and Indiana, (4 Kent, 181,) and to which may be added California; and yet in those States, in the construction of the effect of their decrees for a sale, the Courts have held that the decree barred, *ex proprio vigore*, the mortgagor's equity of redemption.    Thus in Lansing *v.* Goelet, 9 Cow. R., 346, it was decided that a decree of foreclosure and sale, and a decree of sale without any express decree of foreclosure, were equally a complete bar of the equity of redemption.

In Kentcky, in the case of Patterson *v.* Carneal, 3 Marsh. R., 621, it was held that a mortgagee, after a decree of sale, holds the legal estate, and may sell the mortgaged premises.    In what respect is the estate of the mortgagee, after foreclosure, less perfect and absolute because the officer of the Court, or sheriff, may be directed to sell the premises?    See Whiting *v.* The Bank of the United States, 13 Peters' R., 15.

In Slaughter *v.* Foust, 4 Blackf. R., 381, the Supreme Court of Indiana said, " A mortgagee has three modes of enforcing satisfaction of his demand, to which he may resort concurrently or separately, at his election ; he may bring ejectment, and thus acquire the rents and profits of the mortgaged premises until his debt be satisfied; or he may sue at law on the evidence of his claim, in which case he looks, in the first instance, to the personal property of the mortgagor ; or he may by a proceeding in chancery enforce a lien on the land.    The result of this latter process, in England, is generally a strict foreclosure of the equity of redemption of the mortgagor, and the investment of an absolute estate in the mortgaged premises in the mortgagee.    Under the law of this State, the equity of redemption is also foreclosed; but the land is sold for the satisfaction of the debt, and the overplus arising from the sale, if any, is returned to the mortgagor.    This difference in the result, however, does not change the character of the proceeding, which in both countries is *in rem*.

Our statute, which declares " a mortgage of real property shall not be deemed a conveyance, whatever its terms, so as to enable the owner of the mortgage to recover possession of the real property without a foreclosure and sale," (Practice Act, § 260) does not change the law as to the respective estates of mortgagor and mortgagee.    It goes no further than to disable the mortgagee from entering for condition broken, and drives him to a judicial foreclosure and sale of the premises for the satisfaction of the mortgage-debt.

A statute, having a similar effect, exists in New York (2 Rev. Stat., 312, § 57 ; 11 Wend., 538 ; 2 Denio, 176, note,) yet it was never pretended there that the mortgagor's equity of redemption remained after decree of foreclosure.    10 Paige R., 246.    Our

statute, (Practice Act, § 260,) in fact recognizes the legal effect of the mortgage as a grant of the legal estate to the mortgagee, which becomes absolute on condition broken, by affirmatively providing that the mortgage shall not be deemed a conveyance, whatever its terms, so as to enable the owner of the mortgage to recover possession of the property without foreclosure and sale.

The doctrine of the adjudged cases may be stated, without hazarding successful controversy, to be that after decree of foreclosure or judicial sentence, and immediately thereupon, the entire estate, both legal and equitable, becomes vested in the mortgagee, subject only to a judicial sale, from the proceeds of which the mortgagor may, perchance, derive the benefit of a resulting surplus.

2. The appellant was not, and did not become, by reason of his judgments, or either of them, at any time, a creditor having a lien on the property in controversy, or on any share or part thereof; and hence he was not entitled to redeem such property from the sale thereof, under the decree of foreclosure of said mortgage.

Subsequent incumbrancers of the estate mortgaged, whether by judgment or mortgage, by the same system of jurisprudence that raised the equity of redemption to the dignity of an estate in the land, have an equitable right to redeem, and may, in a Court of Equity, enforce such right, unless barred thereof by statute or the decree of a competent Court.

The involuntary alienation of land, or an estate therein, that is an alienation by mere act and operation of law, did not exist by the common law of England. The tendency of the feudal system was to secure to the lord the exclusive services of his tenant; and hence the feudatory could not subject himself or his landed estate to the payment of his debts; his goods and the profits of his lands alone were liable. After the strictness on alienation of estates was partially removed, to remedy the evils consequent upon such alienation by the debtor, and the inconvenience attending the proceedings by writ of *levari facias*, the statute of Westminster 2d, 13 Ed. I, c. 18, was enacted, under which a judgment obtained in any of the Courts of Westminister, became a lien on freehold estates, as it enabled the judgment-creditor to obtain possession of a moiety of the debtor's lands and tenements by the writ of *elegit;* and, in certain cases, by the statutes, merchant or staple, the whole thereof, by extent. The judgment so obtained became, however, only a general lien. Finch *v.* Winchelsea, 1 P. Williams R., 279 ; 9 Mod. R., 365, and affected only the legal estate of the debtor.   2 P. Wms., 492.

Courts of Equity, holding the equity of redemption to be an estate in the lands mortgaged, and at the same time regarding the claim of the judgment-creditor as a just charge against the

debtor's remaining interest in such lands, upon the maxim, *æquitas sequitur legem,* recognized the judgment of the creditor as affecting the debtor's equity of redemption; and as the creditor, under such circumstances, had no remedy at law to render his equity available, these Courts aided him to make his claim effectual by subjecting the estate, after the discharge of prior incumbrances, to the satisfaction of his judgment.

The rule that a subsequent judgment-creditor may redeem from prior incumbrances, has been long and firmly established, but as the lien is only upon the equitable estate of the mortgagor, it follows as a logical deduction, necessary to the preservation of the law as a science, that it can be enforced, in the absence of positive law on the subject, only in a Court of Equity.

The point under consideration involves two questions—the first is, did the judgments of the appellant, recovered after the decree of foreclosure, or either of them, become a lien on the land in controversy? And the second is, was the appellant, as a judgment-creditor of Randall, entitled to redeem the property from the sale made under the decree? If the first of these inquiries is determined in the negative, the negative of the second follows as a corollary of the first.

1. The negative of the first of these questions is involved as a necessary consequence of the determination or foreclosure of the equity of redemption by judicial decree; which view is materially strengthened by the rule that uniformly prevails in Courts of Equity, that incumbrancers subsequent to the mortgage, but prior to the filing of the bill for the foreclosure thereof, must be made parties thereto. Coote on Mort., 504, 505; 3 Powell on Mort., 990, 991. This is required in order to prevent multiplicity of suits, and that the proceeds of the mortgaged estate may be duly distributed. 4 Kent, 184. "The reason of the rule," says Chancellor Kent, "requiring incumbrancers, subsequent as well as prior to the plaintiff, to be made parties, is to give security and stability to the purchaser's title; for he takes a title only as against the parties to the suit; and it can not and ought not to be set up against the subsisting equity of those who are not made parties." Incumbrancers who are not made parties to the suit will not be bound by the decree. 2 Vern., 601, 963; 2 P. Wms., 643; 3 Ves., 314. This was so held by Chancellor Kent, in an able review of the subject, in Haines *v.* Beach, 3 John. Ch. R., 459. See also Story's Eq. Plead., §§ 194, 201; and Watson *v.* Spence, 20 Wend. R., 282.

But as to persons who become incumbrancers after bill filed, Judge Story states the rule as follows: "But incumbrancers who become such *pendente lite,* are not deemed necessary parties, although they are bound by the decree; for they can claim nothing except what belonged to the person under whom they assert title, since they purchase with constructive notice; and

there would be no end to suits, if a mortgagor might, by new incumbrances, created *pendente lite*, require all such incumbrancers to be made parties. Story's Eq. Plead., § 194. In a case (Bishop of Winchester v. Beavan, 3 Ves., 314) before Lord Anvanley, M. R., he said, a judgment confessed after bill filed would not do, that it would not create an equity. In Cook v. Mancius, (5 John. Ch. R., 94,) Chancellor Kent said : " The plaintiff became an incumbrancer *pendente lite*, and therefore, according to the doctrine in the case of the Bishop of Winchester v. Paine, (11 Ves., 194,) it was not necessary that he should have been made a party, and he has no right to redeem.

The reason of the rule which bars the equity of the creditor, who obtains a judgment *pendente lite*, and denies to him the right to redeem, applies *a fortiori* to the creditor whose judgment is obtained subsequent to the decree of foreclosure.

If the judgments of the appellant, obtained subsequent to the entry of the decree of foreclosure, could become a lien on the land in controversy, then, according to the theory insisted upon on behalf of the appellants, to the effect that the legal estate in the premises remained in Randall, until deed executed under the foreclosure sale, a judgment obtained against Randall on and even after the thirteenth of December, 1856, would have become a lien on the same land.

2. From the foregoing views it follows as an inevitable sequence, that the appellant was not entitled to redeem the premises from the sale thereof under the decree of foreclosure, for he was not a creditor having a lien by judgment or mortgage on the property sold, or any share or part thereof, subsequent to that on which the property was sold, within the provisions of the statute. Prac. Act, § 230, Sub. 2.

3. The right of redemption given by the statute to the judgment-debtor or his successor in interest, and to a creditor having a lien by judgment or mortgage on the property sold, or some share or part thereof, subsequent to that on which it was sold, is a mere right created by the statute.

The statutory right to redeem land sold on execution, and also under a decree of foreclosure, (2 Cal. R., 595,) is purely personal. This right, in its qualities, resembles somewhat the nature of an advowson, of which Sir William Blackstone says : " It is not itself the bodily possession of the Church and its appendages. * * * * The advowson is the object of neither the sight nor the touch ; and yet it perpetually exists in the mind's eye, and in contemplation of law. It cannot be delivered from man to man by any visible bodily transfer, nor can corporeal possession be had of it." 2 Black. Com., 21.

This statutory right is not of equal dignity to the equity of redemption, denominated an equitable estate in the land, but it

exists in abstract contemplation, possessing no element of corporeal property.  Kelly and wife v. Beers, 12 Mass. R., 387.

The right to redeem, thus created by statute, is a legal right, as contradistinguished from the equitable right to redeem, existing in favor of a mortgagor, or one having a lien by subsequent mortgage or judgment on the premises, and is not capable of being enforced otherwise than as a legal right, standing in derogation of the common law rights of the mortgagee or purchaser, under the decree of foreclosure.  It is not a thing that can be the subject of a lien, because it is not property in any sense; it is a *mere pre-emption*, and its entire value is dependent upon the performance of conditions precedent to the rendering of it productive of property.  The performance of the necessary precedent conditions, is wholly a matter of volition on the part of the person holding such right; and, until such performance, there exists nothing beyond a *privilege* to become the purchaser of the estate, on specified terms.

From the views already stated, in respect to the nature and qualities of this right, it follows that it cannot be seized and sold on execution.

4. If the Court should hold that Randall, under and by virtue of the statute creating the right to redeem, as therein specified, had an interest in the said premises after decree of foreclosure, then, upon such hypothesis, there is no error in the decision of the Court below, and the judgment thereon, because the appellant, on the 13th of December, 1856, had no capacity or right to redeem said lands, from the sale thereof, under the decree of foreclosure.

1. By § 230 of the Practice Act, there are two classes of persons who may redeem:

First, the judgment-debtor or his successor in interest.

Second, a creditor having a lien, by judgment or mortgage on the property sold, or some share or part thereof, subsequent to that on which the property was sold.

The second class are termed redemptioners.

The finding of the facts by the District Court, which are conclusive upon the parties in this forum, shows that the appellant appeared before the sheriff, and there assumed the right to redeem, in the character and capacity of a "redemptioner."  Having thus presented himself as a redemptioner, he should not be allowed to appear in this Court in any other character.  Klock v. Cronkhite, 1 Hill R., 110.

In order to have entitled the appellant to redeem on the 13th of December, 1856, it was necessary that he should have been a creditor, having, at that time, a lien, by judgment or mortgage, on the property in controversy.  Practice Act, § 230, sub. 2; Erwin v Schriver, 19 John., 379; Hurd v. Magee, 3 Cow., 35; Merry v. Hallett, 2 Cow., 497.

The authorities are uniform to the effect that, if the appellant had no lien, as a creditor, on the property sold, when he came to redeem, then he had no standing, in the premises, as a redemptioner.

Even if the foreclosure could not have become complete, as a bar, until a sale under the decree, that having taken place in June, 1856, it, from that time, barred the parties to the suit of foreclosure, and all others, making claim of any sort, dependent upon the title of Osio or Randall. By a construction of the effect of the decree of foreclosure, most favorable for the appellant, his case, after sale under the decree, was within the rule laid down in Klock v. Cronkhite, 1 Hill R., 110, in which it appeared that one Elwood, who had recovered a judgment against the mortgagors of certain premises, sold the same premises, before foreclosure, on execution upon his judgment, and became the purchaser. The sale, under the mortgage-foreclosure, was made before Elwood received his deed from the sheriff. The question arose, in this case, whether Elwood had a lien on the premises at the time of the mortgage-sale. The Court held that he had not; and Justice Bronson, who delivered the opinion of the Court, said : " He (Elwood) had previously sold, under his judgment, and his right to a deed had become perfect on the 8th of February, 1836, when the time for redeeming expired. * * * * At the time of the sale, Elwood stood in the character of grantee, or assignee, of the mortgagors, and, as such, he was foreclosed of all equity of redemption."

* * * * * * * *

" Elwood must claim in one of two ways, and not in both. He must say, either that he is the owner of the equity of redemption, at the time of the mortgage-sale, or that he was a judgment-creditor, having a lien. If he claims the equity of redemption, the answer is, that that interest has been foreclosed ; if he claims merely as a judgment-creditor, having a lien, he must then go into equity and redeem."

The appellant stood in no better predicament, at the time of the foreclosure sale, than did Randall. In a case before Chancellor Walworth, where it was sought to be maintained that the right of redemption remained open until the purchase by the mortgagee, was consummated, the deed delivered, and the report of the sale confirmed, he said : " If such a rule exists, it is one which I never heard of before; and no such right has been claimed, by the owner of the mortgaged premises, in any suit or proceeding, before me, during the fifteen years that I have presided in this Court." Brown v. Frost, 10 Paige Ch. R., 246.

2. According to the finding of the facts by the Court below, all the interest of Randall in the premises, if any he had after decree of foreclosure, was sold on the 12th of March, 1855, under an execution issued upon the judgment of Smith, recovered in

the month of November, 1854, and purchased by defendant Richards, who, long before the time of the attempted redemption, had received his deed of conveyance.  The sale under this judgment was made several months before the recovery of the appellant's second judgment, and hence such second judgment could not be made available as the basis of a redemption on the 13th of December, 1856, as it was barred by the sale and conveyance under the Smith judgment.  Then if appellant had any right to redeem as a judgment-creditor having a lien, it could only be by virtue of his judgment, obtained against Randall in January, 1855.  But in respect to this judgment it appears that an execution was issued upon it on the 12th of January, 1856, and all the interest of Randall in the premises, if any he had, was again sold by virtue thereof, on the 17th of March, 1856, so that the lien of that judgment, if it ever was a lien on said premises, became destroyed by the sale of Randall's interest under it.

In Hewson v. Deygert, 8 Johns. R., 333, the Court held that the sale of land on the first instalment of a judgment, extinguished the lien of the judgment as to that land.

In Ex parte Stevens, 4 Cow. R., 133, it was held that a sale of land by virtue of a judgment and execution thereon issued, though for only a part of what was due on the judgment, with the lapse of fifteen months (the time allowed by statute for redemption) from the time of sale by the sheriff, destroyed the lien of the judgment for the balance remaining due; and the judgment-creditor for the balance could not redeem the land from a purchaser under a senior judgment; such a sale destroyed also the lien of all junior judgment-creditors.   See, also, Klock v. Cronkhite, 1 Hill R., 110.

Then, proceeding upon the hypothesis that Randall had an interest in the premises, which became charged with a lien by the first of appellant's judgments, and which interest was sold to appellant on the 17th of March, 1856, under an execution issued on such judgment, then immediately after the 17th of September, in the same year, the appellant was entitled (as there was no redemption from such sale) to a deed of conveyance of the premises, from the sheriff.   By such sale and conveyance Randall was divested of all his interest in the premises, and from that time there was no interest in him whereon the judgment could subsist as a lien.

Wright v. Douglass, 2 Comstock's R., 373; Jackson v. Ramsay, 3 Cow. R., 75; Jackson v. Dickenson, 15 John. R., 309; Waller v. Harris, 20 Wend., 558; 7 Paige R., 177.

If the doctrine of these authorities be true, then it results that the appellant was not, at the time of his alleged redemption, a creditor having a lien by judgment, or otherwise, within the statute:—and having on that occasion represented himself as a "redemptioner," he ought not to be allowed now to

shift his position to that of a successor in interest. But if he were permitted so to do, it is difficult to understand in what respect he would be in any better predicament, if the authority of Klock v. Cronkhite, and the cases cited, as to the necessary and proper parties to a bill of foreclosure, are to be regarded as containing sound rules of law.

5. Even if the appellant, by his judgment, acquired a lien on the lands mentioned, and such lien continued until the time of the alleged offer to redeem, still he failed to effect a redemption of said lands from the sale thereof, under the decree of fore-closure.

Section 234 of the Practice Act designates the vouchers and proofs which a redemptioner shall produce to the officer or person from whom he seeks to redeem; and section 231 specifies what amount of money shall be paid for the purpose of redemption, and the time within which it must be paid; and section 233 provides that the necessary payment may be made to the purchaser, or, for him, to the officer who made the sale; and also that a tender of the money shall be equivalent to payment.

Then, in the first place, was the officer who made the sale under the foreclosure, to be deemed the agent of the purchaser at such sale? This depends upon the fact whether or not he was constituted such agent. By the statute he had capacity; but, before he could become agent, or trustee, it was necessary he should be constituted such by one having the power, that is, by a creditor having a lien and entitled to redeem, by the giving of the notice required, (§ 232,) and by the production of the evidence specified (§ 234.) Without the action of a creditor having a lien, the sheriff cannot become the agent, or trustee, for the purchaser; and, by such action, he can become no more than a special agent, or trustee, for the purpose specified in the statute; and then, as was said in a like case, "he must conform to the authority with which he is clothed. If he does not, his acts are void." Dickinson v. Gilliland, 1 Cow. R., 498. It should be remembered that, if the sheriff was constituted agent, or trustee, for the purchaser, in this case, it was without, and independent of, the action or consent of the purchaser. In such case, he was made such agent, or trustee, by the constituting power of the appellant; and, in whatever respect he may have deviated from, or gone beyond, the duty required of him by the statute, as such agent or trustee, in that respect, as to the purchaser or his assignee, his acts were coram non judice, and void. Griffin v. Thurston, 2 How. U. S. Rep., 245, 256, 257; McFarlan v. Gwin, 3 How. U. S. R., 717, 720.

It cannot be denied that a person who would redeem must pay, absolutely, the amount necessary to effect the redemption. Did the appellants so pay such amount?

A payment, in its true sense, presupposes the sum paid to have

been due; and to say that one paid, when nothing was due, is a solecism.

In the case of a redemption, under the statute cited, the creditor, seeking to redeem, must ascertain and determine for himself, and at his peril, the sum necessary for the purpose; and must pay it unconditionally, and untrammeled by terms or reservations.

In Ex parte Raymond, 1 Denio, 275, the Court said : "A party, seeking to acquire the rights of a purchaser, under this statute, (the Statute of Redemption,) must take care to comply fully with its requirements. * * * * The papers, in the hands of the sheriff, showed what sum was required to be paid to make a legal purchase of the land; and, although the relator and his counsel were present, they were not bound to volunteer anything on the subject. * * * * The matters of fact were equally well known to all the parties; and as to the law, each would determine for himself, and act at his peril."

In the case here cited, one subsequent creditor sought to redeem from another, who had acquired the right of the original purchaser of land, sold on execution, by paying the necessary sum; and though, from the case, it appeared that he believed he had complied with the law, and in good faith intended to pay all that was necessary to effect the object, still as his payment was insufficient in amount, the Court held him bound and barred by the omission.

In support of the same principle, see the cases of Dickinson *v*. Gilliland, 1 Cow., 498; People *v*. Covill, 18 Wend., 598; Waller *v*. Harris, 20 Wend., 555; Silliman *v*. Wing, 7 Hill, 161.

The rule, requiring a strict compliance with the demands of the statute, in order that a redeeming creditor may acquire the benefits contemplated by its provisions, rests upon principle as well as authority. It is the mode and means by which the creditor becomes, in effect, the purchaser of the estate so redeemed, and that, too, without the consent of the prior purchaser; and for both these reasons, there must be a strict compliance with the requirements of the statute; and there can be no condition so entirely indispensable as the unqualified and unclogged payment of the amount due.

The payment required can not be evaded by instituting a controversy with the officer, or by imposing on him duties which do not pertain to his agency in the premises. The appellant can not be excused his delinquency because of a mistake or over-demand of the officer, if made, for he was bound to determine the amount for himself, and pay or tender payment of it, in the one case; and in the other, the officer could not, *as agent*, demand anything whatever.

What does the appellant seek to do in this case, other than to secure to himself, by a device, the advantages of a redemption,

without allowing the party entitled to the money, if a redemption was made, a dollar of it?

The delivery of the money to the sheriff, could not operate as a payment; for the declaration made at the time, that that was not the end of the matter, and that it would probably be tied up for several months in litigation, followed immediately by an action against the sheriff for a recovery of a large portion of it, and an attachment of the whole of it; and afterwards again by a suit in chancery, on behalf of appellant, locking it up by injunction, to await an accounting for the purposes of a redemption, after the time limited by statute had expired, was certainly loading it, as a payment, with clogs, qualifications, and conditions, which followed and incumbered the money wherever it might be, until the objects of the protests or conditions made, might be determined by the threatened litigation. Strong v. McConnell, 10 Vermont R., 231.

A payment to effect the object of a redemption of lands, under the statute cited, must be as absolute and unqualified as must be a tender, which it seems the statute provides, may be made. A tender, standing alone, involves the idea of a refusal on the part of the tenderee to accept the thing tendered. The same thing must be done in a case of tender, as far as it goes, as in case of payment. A tender accepted is a payment or performance; a payment made, involves the acts which would constitute a tender, if the matter or money offered in payment had been refused. The law of tender, therefore, is in strict analogy to the question of payment in the case at bar.

Mr. Greenleaf (2 Green. Ev., § 605,) states the rule in respect to tender to be, that the tender must be absolute, and without terms or conditions. In Peacock v. Dickerson, 2 Car. & Payne, 52, (12 Eng. Com. Law R., 24,) Abbott, C. J., said: "A party tendering money, should pay it without making any terms, and should leave it still open to the one party to say that more was due, and to the other to say that the sum tendered was sufficient"

The case of Wood v. Hitchcock, 20 Wend., 47, is deemed as clearly in point. In that case, it appeared that the parties had attempted a settlement, at which the plaintiff claimed a balance due him of $100, the defendant insisting that $77 was all that was due, but offered to pay plaintiff $85, and made a formal tender of such sum in full settlement, which plaintiff refused to accept. When sued, the defendant pleaded a tender of the $85. The Court said: "The tender was defective. It was clearly a tender to be accepted as the whole balance due, which is holden bad by all the books; the tender was also bad, because the defendant would not allow that he was even liable to the full amount of what he tendered. His act was within the rule which says he shall not make protest against his liability.  *  *  *  It is not of the nature of a tender to make conditions, terms, or

qualifications, but simply to pay the sum as for an admitted debt; interlarding any other object will always defeat the effect of the act as a tender." See, also, Robinson *v.* Batchelder, 4 N. Hamp. R., 407.

Then, as a question of tender, if it is to be adjudged bad, because the party denies his liability to the full amount of what he tendered, and makes protest against such liability, should not a person who is seeking to avail himself of a statutory right and privilege, which is in derogation of the common law right of another, make absolute and untrammeled payment of the amount necessary to secure the benefits of such right and privilege? If one can not effectually tender, protesting against his liability, how can a person pay, protesting against that which is required of him, if he would avail himself of the advantages of such privilege?

If the delivery of the money to the officer could be treated an absolute payment of the whole sum, then the subsequent acts and proceedings of the appellant, in stopping the money *in transitu*, was a withdrawal of it from the object professedly designed, and an abandonment of the redemption. That the appellant had control over the money, and concerning it, and possessed the right of stoppage *in transitu*, need not be controverted now. That he exercised such power by the aid of judicial process, stands confessed; and it matters not whether he employed the effective means and exerted the power to seize upon this money by right or without right. If by right, then as the exercise thereof intervened to defeat the delivery of the money to Hyatt, the original deposit with the sheriff became abortive as a payment; if by wrong, or without right, then, as the same effect was produced, he is not in a position to escape its consequences. *Nullus commodum capere potest de injuria sua propria.*

The appellant cites the case of Ex parte Newall, Receiver, 4 Hill, 589. What was that case, and how does it aid the appellant?

In that case, it appears that Brisbane purchased the land of Hichcox, which was sold on execution. Addington, a judgment-creditor, in due time redeemed, by paying Brisbane his bid, with interest. A certain bank, of which Newall was receiver, had a judgment against Hichcox, older than those on which Addington had redeemed. Under this judgment, Newall, subsequent to the redemption by Addington, redeemed by paying Brisbane's bid, with interest. Addington then went to the sheriff and paid the amount claimed, as due on the bank-judgment; but before he paid, he filed a bill in chancery against the receiver, alleging that the bank-judgment had been satisfied, and obtained an injunction forbidding the sheriff to pay over to Newall the money which he, Addington, might pay to redeem, until the further order of the Court of Chancery. Addington first paid the money to the

sheriff, and immediately after served the injunction on the sheriff, forbidding his paying over the money to Newall. The question was, did Addington redeem? The Court were of opinion that he did. Justice Bronson said: " He (Addington) made an unconditional payment of the amount of the bank-judgment, and the sheriff received and receipted the money, before the injunction was served. The redemption was complete, and the subsequent service of process, to stay the money in the hands of the sheriff, could not undo what had already been well done. It is not like a case of tender, trammeled with conditions, or an offer of payment without parting with the money. Addington put the money entirely beyond his control."

The contest in that case was between two claiming as creditors. Addington alleged that the bank-judgment had been satisfied, and that it was being used in fraud of his rights in the premises. He was seeking a discovery of the fraud, and for a decree declaring the bank-judgment satisfied. This was the only subject of controversy, and was of equitable cognizance. The fraudulent claim of the bank, unless impeached, would cost Addington the amount of the bank-judgment, and he had the right, in a Court of Equity, to thus have it discharged, as an incumbrance on his property, asserted and existing in fraud.

Let Addington's cause of complaint be kept in view. In this case there exists no such grievance. The amount necessary to be paid to redeem, was a fact as well known to the appellant as to the sheriff, and there was no question as to the right, in law or equity, of the assignee of Cary to the money, if a redemption was made. The redemption had to be made within a specified period. The appellant's suit in equity was for an accounting or ascertainment of the amount of money to be paid to redeem It was in effect a bill to redeem, after the time limited for the purpose by statute, had expired. The appellant's suit at law, for the recovery of $10,000 of the money, effectually denied that the money had been paid. Between the cause of complaint in the chancery suit mentioned in Ex parte Newall, and the causes of complaint in the action of appellant, there seems to be no analogy.

On the appellant's behalf, it is argued :

1. That the money left with the sheriff, constituted a fund in trust, in which the appellant had an interest. The proximate and inevitable effect of this position is, that the deposit did not constitute a payment; and, if the sheriff held the funds in trust, for the appellant and Hyatt, an accounting was necessary before it could be ascertained to what portion of it each of the parties was entitled; and hence it follows, that no part of the money vested in Hyatt.

2. That the payment, under the circumstances, was involun-

tary, and the protest saved to the appellant the right to sue the sheriff, and recover it back, as money had and received to and for appellant's use.

If the payment was not voluntary, the result is that the appellant's property in the money did not pass from him.

3. That the appellant was a creditor, having a lien, by judgment, on the thirteenth of December, 1856, and, in the capacity of redemptioner, could redeem.

This proposition, it is submitted, has already been fully met, in the various phases in which appellant has presented it.

4. That appellant had the right to redeem the premises, in discharge of a lien upon his own land.

This proposition assumes that appellant undertook to redeem in the character of successor in interest.

If the position were maintainable, in any view, then, as there was no evidence produced to the officer that appellant was a successor in interest, the officer had no authority even to receive the money, as for a redemption, by him, as a successor in interest. And to discharge the incumbrance, as the appellant assumes it was, he, as the claimant of the land, which stood charged, *in rem*, should have sought out the creditor who held the incumbrance, and paid him the sum necessary for its discharge. The officer could not act without the authority of the incumbrancer, which it is not pretended he had.

*J. A. McDougall and J. B. Weller* also for Respondents, in the ejectment-suit.

We insist upon three positions, either of which governs the conclusion in this cause, if it can successfully be maintained.

1. That a lien will not attach to real property by judgment against a mortgagor, after condition broken and decree of foreclosure.

2. That after a sale upon a judgment and execution, part only of the judgment being satisfied, the residue of the judgment ceases to be a lien upon the premises sold.

3. That in this case there was no redemption in fact.

The last in order of these positions, we insist upon as just, beyond the chance of controversy.

1. As to the first position, it is not denied but that it is correct, according to the rule of the common law. It is, however, insisted that our statute has changed the rule. We say the only change made by our statute, is as to the possessory remedy, and not as to the position of either the legal or equitable title. Pr. Act, 260.

Originally, at common law, the owner of the fee held the entire estate; of which he divested himself only by livery of seizin. A mortgagee received livery of seizin, and the entire estate. Subsequently, upon a modification of the manner of conveyances,

the mortgagee took at law by the terms of his grant, and acquired the entire estate, or the legal right thereto, absolutely upon condition broken. Such is the common law rule now, and it operates a mere enforcement of the contract of mortgage by its terms.

Chancery exercising the equitable and supervisory jurisdiction of the crown, undertook to say, that the contract relations of the parties should be subject to their equitable relations. That a mortgagor should have equity as long as he offered to do equity, and until chancery herself interposed a bar.

This right of appeal to chancery was not upon the idea of an estate in the mortgagor, although within the limits of chancery jurisdiction it was so treated. It was a mere protection against an inequitable advantage the mortgagee might take by the strict rule of the law.

In England and this country, the practice on the part of the mortgagor is to file a bill to redeem upon payment of the debt, and this right to redeem through the Courts of Equity continues until equity itself bars this right by decree.

Until recently, the uniform practice in England was to decree a strict foreclosure at the suit of the mortgagee.

The Irish practice was to decree a foreclosure, and bar the equity of redemption, but at the same time decree a sale of the mortgaged premises, and charge the mortgage-debtor with the residue of the debt, over and above the amount realized from the sale.

This practice has been adopted in many of our States, and is the basis of both the practice and legislation in this State.

The decree foreclosing the equity of redemption, and directing a sale, was as complete an extinguishment of the estate as a decree of strict foreclosure.

All that remained to the mortgagor was his right to the surplus, if any, and the common right, with every other person, to purchase at the sale.

With us, the legal estate proper is still governed by the contract of the parties, or in other words, by the terms of the deed ; and this legal estate passes to the mortgagee upon condition broken. With us, it is also true, that the interest, right or estate which was the creature of Courts of Equity, is still within the jurisdiction of equity.

The power to bar the equity by decree of foreclosure, has always been and still continues to be exercised by our Courts without question, and it is well understood that without decree of foreclosure the equity would continue in the mortgagor as formerly.

If, then, the strict legal estate was not in Randall, and if it was competent for the Courts of Equity to bar his equitable right; and if this was done by decree of foreclosure before

McMillan's judgment was filed, what was there upon which McMillan could acquire a lien ?

Prac. Act, p. 207, provides that the transcript of judgment filed " shall become a lien upon all the real property of the judgment-debtor." If a legal estate had been extinguished by contract, and the equitable estate by decree, how could the premises in question be called or described as the "real property" of Randall ?

The position of appellants must be this, that our law creates a new statutory estate or property. So that we would have the legal estate before condition broken, the equitable estate until barred by foreclosure, and a statutory estate until sale and conveyance.

Before such an anomaly is engrafted upon our system, it should be well considered by our legislators, and the Courts will certainly never establish it by construction, or without express direction and authority of law.

In Jackson v. Town, 4 Cowen, 599, it is said : " An equitable or legal seizin must be shown on which a judgment can attach and be a lien in order to warrant a sale."

Are we to change the rule and say an equitable, a legal, or statutory seizin must be shown upon which a judgment can attach.

In conclusion, upon this point, we hold that all which the mortgage-debtor has in the land after his equity is barred by decree, is a statutory right of redemption remaining to him, without any present estate, either legal or equitable, which right is nothing more than the personal privilege of re-purchase within certain limitations. The rights which would accrue upon his exercising this privilege is foreign to this question, and need not be discussed. It is clear, so we contend, that if Randall had neither the legal nor equitable property in this land on the seventh of February, 1855, the judgment of McMillan did not become a lien, and McMillan did not acquire the rights of a redemptioner.

In considering the foregoing question and the authorities bearing upon it, some confusion may arise from not distinguishing between cases where the questions arose between judgment-creditors and their respective rights of lien, sale, and redemption, and the case of the claim of a lien after a bar of the equity at the suit of a mortgagee.

The precedent for such a claim we have been unable to find ; and as respondents have failed to present one, we may presume they have been equally unsuccessful.

2. The second position is that the sale by McMillan upon his judgment, extinguished any lien he might have had for the residue.

Without disputing the correctness of this position as a general

rule, the appellant seems to rely upon the decision of this Court, in Vandyke v. Herman, 3 Cal., 295.

In that case it was held that a subsequent redemptioner must pay the entire amount of the judgment upon which a previous sale has been made.

We do not conceive our position necessarily affected by that decision; but as that opinion has been presented as authority in this case, with all due respect for the learned Judge who pronounced that opinion, we take the liberty to submit that it is not justified by the statute upon which it purports to be founded, and is directly in the face of all the authorities cited in the case by the counsel upon either side.

The statute, Practice Act, section two hundred and thirty-one, provides that in redeeming from a purchaser, "if the purchaser be also a creditor having a lien prior to that of the redemptioner," the redemptioner shall pay the amount of such lien, with interest.

This rule we acquiesce in; it is and always was the law with regard to redemptions. It is the rule in every State, and never was disputed.

The question was, had the judgment-creditor who bid in for a sum less than his judgment, a lien for the residue; and the opinion of the Court was a mere begging of the question presented by the case.

That decision became necessarily the law of that case; but one decision against authority and reason cannot make the law of the land. Uniformity of decision is desirable, and becomes most important when interests have become established upon the faith of a rule promulgated. But in a matter of this kind, there is no good reason why a palpable error (if there be one) should not be corrected, and a return made to well established rules.

The following are the cases cited in Vandyke v. Herman, by the two parties: 5 Hill, 228; 4 Cowen, 132; 2 Hill, 51; 8 John., 333; 2 Wend., 297; 7 Cowen, 367, 658; 1 Cowen, 501; 1 Barbour S. C., 388.

By glancing at these authorities, it will be perceived that we are justified in the position we have assumed. In Hewson v. Deygert, 8 John., 233, the Court says: "It is to be presumed that the lands sold, under the former execution, for their value; and the purchase is to be considered as absolute, in respect to the lien or judgment under which they were sold. The sale extinguished the lien as to the lands sold."

Vandenberg v. Briggs, 7 Cowen, 366, decides the exact point in question. So, also, The People v. Easton, 2 Wend., 298. The rule laid down in the other cases does not conflict with these decisions, and so far as they bear upon the question, lead to the same conclusion.

McMillan v. Richards.

If, however, Vandyke *v.* Herman be authority and the law, and if a redemptioner must pay the entire amount of the anterior judgment, and if the residue of the judgment remains a lien so far as to charge a subsequent redemptioner, it does not follow that the judgment-creditor who has once seized the property and sold it, can himself redeem. That the creditor may take the property for his debt, and by his own act make a sale thereof, and by virtue of the same right or power he had to make the seizure and sale take it from the purchaser, involves a palpable absurdity.

The respondents in this case, however, rely less upon any question of law which may be mooted by counsel, than they do upon the fact and finding that McMillan never did redeem.

3. To make this piece of legal legerdemain a redemption, is to make a pretence equal to the thing pretended. It is to give effect to a stratagem, whereby it was designed to avoid the substance of an act, by the substitution of its form. It is to make a pretended offer to do a thing equal to the act performed.

The entire facts are embodied in the findings of the Court, and we will present them in brief.

It was found by the Court, and the correctness of the finding is not questioned, that $24,146 was sufficient, and $17,600 insufficient to effect a redemption.

It appears that in depositing the excess over $17,600 with the sheriff, the same was not deposited with him to be paid to Hyatt, the purchaser from whom McMillan pretended to redeem, but with an express protest against such payment.

That no part of the entire $24,000 was deposited with the sheriff to be paid to Hyatt, but, on the contrary, with the express request to the sheriff that he should make a deposit of the entire sum with Garrison, Fretz & Ralston, to save interest, and to await a proposed litigation, with notice from McMillan that such litigation was intended, and that the whole amount would probably be tied up for several months.

That before the sheriff could dispose of or pay over the money, or any part thereof, to Hyatt, McMillan seized $10,000 thereof in the hands of the sheriff, by process of attachment, and the sheriff, on the same day, having deposited the entire amount in two banking-houses in San Francisco, that McMillan seized the entire amount in the hands of the bankers, by the same process.

That a short time thereafter McMillan filed a bill in equity against the sheriff and the bankers with whom he had deposited, praying for a receiver to take and hold the entire sum pending suit, also for an injunction against the payment over of any part thereof; and that such injunction was sued out and served.

That this same condition of things continued down to the commencement of this suit—and it still continues.

It clearly appears that McMillan (we use the name of McMil-

26

lan to represent the true parties acting and in interest,) by the act of deposit with the sheriff, did not intend to pay Hyatt anything; that he did not even suggest or propose that Hyatt should receive anything; that he directly interposed, by protest as to part, and by action at law and in equity, as to the residue, so as effectually to prevent Hyatt receiving anything; that while admitting, in words, his obligation to pay a part, he himself seizes upon the whole.

To all this Hyatt, the purchaser, is an entire stranger. The redemption is to be effected by paying him the redemption-money. Yet the appellant has the courage, in a Court of Law, to call this a redemption of the estate from the purchaser, who has already paid the price, and has an unquestionable right to hold its equivalent until that price is returned; and has the courage, further, to demand the estate by action at law, and asks judgment of recovery, before the purchaser has received a dollar, and when he has been estopped from receiving a dollar by the direct interference of the appellant.

They do not pretend that Hyatt has received a dollar. It does not appear that Hyatt ever will receive a dollar; Hyatt, as before remarked, is a stranger to this business. He has not seen the money, and he don't know where to find it. Whether or not, under any circumstances, he can ever secure its possession, he is ignorant. All he knows is that certain lands of which he is possessed, and for which he has paid, are demanded of him by action at law, without his having received or been offered anything in return.

It is the high prerogative of sovereignty to seize on private property, but the fundamental law exacts compensation therefor.

The appellant proposes to do by his strategy what the State is not permitted to do by its power.

All these things clearly appear on the face of the record, and it would seem that a bare statement of the undisputed facts should command as certain a conclusion as the most labored argument.

The redemptioner is required by law to make a correct payment, and it is his business to determine the amount. That amount it is his business to pay, not deposit or deliver. It must be paid in good faith, to the use of the purchaser, and with the intent it should be paid to him.

It is true the sheriff is constituted by the law the agent of both parties; but this means nothing more than that the payment by the redemptioner to the sheriff, with the intent of payment through him to the purchaser, is a sufficient redemption, and that under these circumstances the sheriff is authorized to receive the redemption-money for and on account of the purchaser.

It follows that certain acts of the redemptioner are requisite to make the sheriff the agent of the purchaser. Something more

than the delivery of the money to the sheriff, to be held by him, or to be deposited to save interest, or to be seized by stratagem.

Until the money is paid to the sheriff, to be paid to the purchaser, no relation of privity or agency is established between them.

A delivery with protest to a sheriff is not a payment. It might be otherwise if accompanying the protest were instructions to pay over to the purchaser, but otherwise if the protest and claim were made for the purpose of preventing payment. In the latter case the sheriff would pay over at his peril. The reason is that the redemptioner never having consented to the payment to the purchaser, the sheriff could not be his agent for that purpose, agency implying consent and agreement. A further reason is that it must be the act and consent of the redemptioner which constitutes the sheriff the agent of the purchaser, and here the redemptioner not having given the sheriff the money with instructions to pay the same to the purchaser, or with such an intent, the law would not do the purchaser the injustice to establish by implication, relations between him and the sheriff, which the acting parties were seeking to avoid.

Apart from all these matters of strategy, however, suppose that the redemptioners intended in good faith, to redeem, and delivered the sheriff the $24,000, $7,000 thereof under protest, with a claim of right, and with notice to the sheriff to hold the same on his account, and suppose further that the sheriff had paid or tendered to Hyatt the $17,000, retaining, as directed, the residue, could this operate as a redemption from Hyatt? This simple question is a clear test of the strength of McMillan's position. It is clear such an act would not redeem the premises from Hyatt. A fortiori, they have not been redeemed.

*Heydenfeldt & Shafter* for Appellant, in the equity-suit.

1. The bill presents a case of equitable cognizance.

First, it presents a case of trust. Weymouth v. Boyer, 4 Ves. Jr., 423; N. Y. Ins. Co. v. Roulet, 24 Wend., 505. Assuming the allegations, the subject-matter of trust is the $24,146 08. McMillan, Hyatt, and others, are the beneficiaries. There is doubt and controversy among these beneficiaries as to the extent of their several interests, and the purpose of the bill is to settle these conflicting money-rights, and close out the trust by a single adjudication.

Second, the jurisdiction may be put upon the ground of the inadequacy of the remedy at law. Money had and received would not meet the case in all of its exigencies.

Third, or the jurisdiction may be upheld on the principle of *quia timet.* 2 Sto. Eq., §§ 825, 826, 839. Vischer is irresponsible.

2. If the redemption was invalid, then the plaintiff is entitled to the whole of the money,—if the redemption was valid, then

McMillan v. Richards.

he is entitled to judgment for the excess in the payment ($6,700)
charged in the bill and admitted by the demurrer. In either
event, the judgment below was erroneous.

The payment of the excess was compulsory. It is well set-
tled, that where money is paid to relieve the person from impris-
onment, or personal property from an unjust charge, that the
money may be recovered back, on the ground that the payment
was by compulsion.

The same principle applies when the payment is made to re-
lieve land from a like charge, or to save it from an impending
forfeiture. Close v. Phipps, 49 Com. Law, 585; Commonwealth
v. Hall, 8 Pick., 440; Cazenove v. Cutler, 4 Met., 246; Hays v.
Hogan, 5 Cal., 241.

In all these cases, the party making the payment might have
protected himself by a tender, but in making a tender, he must
have assumed the hazard. But the law, in its benignity, relieved
him from the necessity of subjecting his property to the hazard.

3. It is insisted by appellants, that the bill is demurrable, for
the reason that there is no allegation that a demand was made
on Vischer for a return of the money before the suit was com-
menced.

The answer is, that the protest was a sufficient notice to the
sheriff. Hays v. Hogan, 5 Cal., 241.

*John Currey* for Respondent, in the equity-suit.

The facts stated in the complaint do not constitute a cause of
action of equitable cognizance.

1. A Court of Equity will not relieve a party because he did
not understand the law. An eminent Judge says: "It is impos-
sible to foresee all the consequences which would result from
allowing men to avoid their acts and annul their contracts, on
the plea that they did not understand the law. * * * Should
we sanction this doctrine, under the notion of administering
equity, in a hard case, it could not, I think, fail to open the flood-
gates of litigation, and work the most mischievous consequences
in the administration of justice." Champlin v. Layton, 18 Wen-
dell, 417.

2. If the appellant invokes the aid of equity, because he may
have been ignorant of or mistaken as to the amount necessary
to effect a redemption, as a fact, on such ground a Court of Equity
will not grant relief, because his ignorance was the result of his
negligence. *Vigilantibus non dormientibus jura subvenient.* 1
Story's Eq. Jur., § 105; Penny v. Martin, 4 Johns. Ch. R., 569.

"Nor will a Court of Equity interfere upon the ground of ac-
cident, when the party has not a clear vested right; but his
claim rests in mere expectancy, and is a matter, not of trust, but
of volition." 1 Story's Eq. Jur., § 105.

That it was the appellant's business and duty to ascertain for

himself the sum to be paid, in order to redeem and to pay such sum, or tender the same, absolutely, and without terms, we think already appears.   But it may be, and the point we are not disposed to controvert here, that the sheriff, who, by the delivery of the money to him, became the plaintiff's bailee, might be rendered responsible to this plaintiff for the money by him received, as had and received, to the plaintiff's use.

But, in such case, the sheriff could not become liable in an action to the plaintiff until after demand for the money, duly made by him, and refusal on the part of the sheriff to comply with the demand, and then only in an action in a Court of Law; for equity will not interfere where the remedy at law is complete.

In this case, the complaint fails to show any such demand or refusal, and hence, as against the sheriff, no action, either legal or equitable, for the recovery of the money, or any portion of it, can be maintained.

The doctrine of the adjudged cases, cited on behalf of the appellant, to establish that an action for money had and received may be maintained by a party who had parted with his money, under duress of property, will not be controverted by the respondents; but the application of such doctrine to the case at bar, we venture to deny altogether.

In all the cases cited, of money obtained by extortion, oppression, or unlawful exaction, the complaining party had a present vested interest in the property, for the saving of which the money was illegally paid.

The deposit of the money with the sheriff was not made under duress of property, either real or personal; and, though the plaintiff is entitled to and can receive the whole sum, whenever he will, still the respondents are not disposed to yield to his demand in this form of action.

*John Currey* for Appellants, in the proceeding by *mandamus.*

A motion was made in the Court below, by appellant, to transfer this case to Marin county for trial, which motion was denied. The appellant then demurred to the jurisdiction of the Court, which demurrer was overruled.   These decisions, the appellant alleges, were erroneous.

1. The subject of the action or proceeding is situated in Marin county.   The proceeding involves the determination of a right and interest in real estate in Marin county, as appears by the alternate writ of mandate, and because thereof, the proceeding is of the nature of a local action according to section eighteen of the Practice Act, which is as follows:

" § 18. Actions for the following causes shall be tried in the county in which the subject of the action, or some part thereof, is situated, subject to the power of the Court to change the place of trial as provided in this act:

" First, for the recovery of real property, or of an estate or interest therein, or for the determination, in any form, of such right or interest, and for injuries to real property.

" Second, for the partition of real property.

" Third, for the foreclosure of a mortgage of real property."

Before the relator could be adjudged entitled to a deed of the land mentioned in his writ, he was bound to establish a right or interest, either legal or equitable therein.   This right or interest he attempted to set forth in his petition, the material portions of which appear recited in said writ.   Before the relator could obtain the relief which he sought, his right or interest in the real estate mentioned, must needs be adjudged and determined by the Court.

The relator instituted this proceeding to compel the execution by the sheriff to him of a title-deed for said real estate.   Title-deeds are considered a part of the inheritance, and pass to the heir as real estate.   1 Bouvier's Law Dictionary, 387; and the cases therein cited.

In Atkinson, Adm., v. Baker, 4 T. Rep., 229, 230, which was an action of detinue to recover certain indentures of bargain and sale and release, and a certain memorandum in writing, Lord Kenyon said, " Before the plaintiff can recover the deeds in question, she must show a title to the estate in respect to which she claims the deeds," etc.

If the relator prevailed, what would be the command of the peremptory writ of mandate ?   The answer is, to make a conveyance of the premises to the relator.   And how is the relator to establish his right to such a conveyance, except by proving that he is at least equitably entitled to the estate, and by reason thereof entitled to be invested with the legal title ?

2. The proceeding is against a local officer, and public policy demands that such officers should be protected against harassing litigations which require their absence from their posts of duty.

If a sheriff can be compelled to attend on actions brought against him for acts done *virtute officii* or for omissions of duty, at San Francisco, then the sheriff of any county is liable to be forced into the remotest county of the State, whatever the consequences might be to the county he was elected to serve.

The other points taken by the appellant are the same as in the ejectment-suit.

*Heydenfeldt & Shafter* for Respondents, in the proceeding by *mandamus.*

1. The relator is entitled to the relief prayed for, notwithstanding the deed the sheriff has already given him.

The deed of December 26, 1856, was given as consequent upon the relator's purchase of March 17, 1856.   To that deed, in his

capacity of purchaser, he was entitled by a direct provision of law. On the twenty-sixth of December, Randall's right of redemption was gone, and also the right of all incumbrancers subsequent to McMillan. Still, by section two hundred and thirty-two of the Practice Act, the relator is entitled to a further deed, sixty days from the redemption having elapsed.

In the face of a direct statute provision, it is not for the sheriff to say that the deed can do the relator no service. It is at least a further assurance, to which he has a clear right by law.

2. Objection is made to the proceedings below, on the ground that the motion for a change of venue was improperly overruled.

The general rule on the subject of venue, is contained in the twentieth section of the Practice Act, which provides that "the action shall be tried in the county in which the parties, or some of them, reside at the commencement of the action."

An exception to the general rule is, however, made in favor of public officers, by the second subdivision of the nineteenth section, and the first question is, whether this case falls within the general rule, or this exception to it.

We insist that it falls within the rule.

The exception is by way of ease and favor to public officers, extending to them a privilege which is denied to citizens at large, and therefore it should not be extended beyond the just calls of the words in which the exception is stated.

The words are that an action brought against a public officer for "an act done" by him shall be tried in the county where the cause or some part thereof arose.

This is not an action brought for "an act done" by the defendant as sheriff, but to compel him to do an act, which is a very different thing, and is, therefore, not within the exception.

13 Wend., 35, Elliot v. Crouk's Admins.: Held that the statute requiring actions against public officers for "acts done" by them *virtute officii*, to be brought in the county where the fact complained of happened, applied only to affirmative acts, and not to mere omissions or neglect of official duty. *A fortiori* they would not extend to proceedings brought to compel the officer to do an act, as here.

13 Wend., 365, Hopkins v. Heywood: The same point was presented, and the same view taken.

That the "doing of an act" and an "omission to do an act" are distinct and not convertible phrases in the eye of California law, is apparent from the Statute of Limitations. Comp. Stat., 819. "An action against a sheriff, etc., upon the liability incurred by doing an act in an official capacity, and in virtue of his office, or by the omission of an official duty," etc.

Here the idea of malfeasance is kept distinct from that of nonfeasance, and no attempt even is made to express them in

the same form of words. Nor is this distinction a novel one; it is as old as the common law, and furthermore proceeds upon a real difference.

But it is insisted by the defendant that the case, if not within the exception above referred to, is still within the exception stated in the eighteenth section, subdivision first.

This suit is not brought for the distinctive purpose of recovering real property, or an estate or interest therein, nor to recover damages to real property. The complaint obviously presents no such gravamen, and neither seeks or admits of any such relief.

Neither is it brought " to determine " (as by judgment) " any right to an interest in real property."

The people claim no estate in the land, the defendant claims none, and could not, in the theory of the action, claim title to it, even though he were the absolute owner in fact, and there can be no adjudication affecting, in the slightest degree, the rights or the interests of third persons.

The relator simply claims at the hand of the defendant a particular official document. The right to that document as against the defendant, doubtless involves an inquiry into certain alleged proceedings in redemption, but there can be no judgment " determining " that the relator has any property or possessory rights in land as against the defendant, or others. Neither would the sheriff's deed to the relator be anything better than *prima facie* evidence of the fact of redemption in any suit between himself and third persons.

In such suit, the whole question would be open, and the relator would have to prove *de novo* all the conditions of a valid redemption under the statute.

In short, the effect of a judgment for the relator would be not to determine that he was the owner of the land, or had any right or interest in land, but simply to put him the more fully in a position to assert and prove a right of that character. Such is the effect generally of *mandamus*. People v. Fleming, 4 Denio, 143. We admit that the exception in question contemplates a proceeding between citizen and citizen, in which the plaintiff claims as against the defendant, and on any issue he may choose to make, an interest in a thing real, and where the judgment would finally settle the question as between the litigants.

This proceeding differs from that in structure, purpose, and result.

It is urged by defendant that " title-deeds are considered as part of the inheritance, and pass to the heir as real estate."

So were doves in a dove-cote, fish in a trunk, and family pictures, but neither ejectment or any of the actions real would lie for them. Detinue was the specific remedy at law, and in that action the venue was always transitory. 1 Ch. Pl., 269.

In the case cited from 4 D. & E. the action was detinue, and

the right to the papers obviously depended upon the title to the land—and thus the title to the land came collaterly in question.

In that case there was no question of venue made. If there had been, and the action had been brought out of the county where the lands covered by the deeds were situate, the suit would have been defeated, if the views of the defendant's counsel are correct. But in detinue, the venue was always transitory, and the suit would have survived the objection, had it been made.

FIELD, J., delivered the opinion of the Court—TERRY, C. J., and BURNETT, J., concurring.

These three cases were argued together. The first is an action of ejectment; the second, an application for a *mandamus;* and the third, a bill in equity. In the first, judgment was rendered for the defendants; in the second, a peremptory *mandamus* was awarded; and in the third, the demurrer was sustained, and the bill dismissed. The first two cases depend upon the same question—the validity of the alleged redemption by McMillan, of the premises in controversy, from the sale under the decree of foreclosure.

The facts, as disclosed by the records, are briefly as follows: In December, 1851, Osio was the owner of the premises, which are situated in Marin county, and executed a mortgage upon them, to Bird, to secure a promissory note of three thousand dollars, payable in six months, with interest, at the rate of five per cent. a month. Bird assigned the note and mortgage to Edwards, and Edwards assigned them to Cary. In the meantime, Osio sold and conveyed the premises to Randall. In September, 1853, Cary instituted suit upon the mortgage, making Osio and Randall defendants; and in December, 1854, obtained a decree for the foreclosure of the mortgage and the sale of the premises, to satisfy the debt due, which was adjudged to be $8,400, the amount to draw interest at five per cent. a month. From the decree, Randall appealed to the Supreme Court, where, at the April Term, 1856, the appeal was dismissed, with twenty per cent. damages. The *remittitur* having been filed in the Court below, an execution or certified copy of the decree was issued to the sheriff, by whom the premises were sold on the fourteenth of June, 1856, to Cary, for the sum of $16,000. Cary received a certificate of the sale, which, with the balance due him on the judgment, was subsequently assigned to the defendant Hyatt, to whom, on the nineteenth of February, 1857, the sheriff executed a deed of the premises. The defendants claim under this deed.

In November, 1854, Jessie Smith recovered a judgment against Randal l, in the Fourth District Court, and on the twentieth of February, 1855, filed a transcript of its docket in the office of the recorder of Marin county. Upon this judgment execution

was issued, and the interest of Randall in the premises sold thereunder, on the twelfth of March, 1855, for $2,000, at which sale the defendant Richards became the purchaser, received a certificate of sale, and on the ninth of February, 1856, a deed from the sheriff.

In January, 1855, the plaintiff McMillan recovered a judgment against Randall, in the Fourth District Court, for over fourteen thousand dollars, and filed a transcript of its docket in the office of the recorder of Marin county, on the seventh of February, 1855. On the twenty-first of July, 1855, the plaintiff recovered another judgment against Randall, in the Twelfth District Court, for over eight thousand dollars, and immediately thereafter filed a transcript of its docket in the same recorder's office. Upon the first judgment recovered by the plaintiff, execution was issued in January, 1856, and the interest of Randall was sold thereunder on the seventeenth of March, 1856, for $2,000, at which sale the plaintiff became the purchaser, received a certificate of sale, and on the twenty-sixth of December, 1856, a deed from the sheriff.

On the thirteenth of December, 1856, the plaintiff, in company with his counsel, called upon the sheriff of Marin county to redeem the premises from the purchase and lien of Cary under the decree in the foreclosure case—serving, at the same time, upon the sheriff a notice of redemption, accompanied with his affidavit of the amount due upon his two judgments, and duly certified copies of their dockets. On the evening previous, the counsel of the plaintiff had requested the sheriff to prepare a statement of the amount necessary for the redemption, which he accordingly did on the following morning, making the amount $24,126 08. This sum was paid by the plaintiff to the sheriff, with a protest as to certain specified items. The circumstances attending this payment, with the protest and subsequent suits, will be fully stated and considered in determining the question how far the payment operated as a redemption. The District Court of the Seventh District held, in the ejectment-suit, that only the sum of $17,606 87 operated as a legal payment for the purposes of redemption, and that the same was insufficient, and gave judgment for the defendants—whilst the District Court of the Twelfth District held, that a redemption was effected, and ordered a peremptory *mandamus* to the sheriff of Marin county, to execute a deed to the plaintiff as redemptioner.

The first question presented, relates to the right of redemption by the plaintiff. This right is denied by the defendants, and in support of their position, they contend, *first*, that the legal title to the premises passed to the mortgagee, upon the execution of the Osio mortgage, leaving in the mortgagor only an equity of redemption ; *second*, that by the decree in the mortgage case, the equity of redemption was entirely barred and foreclosed, and

the estate became absolute in Cary, the assignee of the mortgage; *third,* that the judgments of the plaintiff having been recovered after the decree of foreclosure, did not attach as liens upon the premises; and, *fourth,* that even if liens by the judgments originally attached, they were subsequently lost; the lien of the first judgment by the sale on the execution, although a part only of the judgment was satisfied by such sale; and the lien of the second judgment, by the sale under the Smith judgment.

There is great diversity of opinion in the adjudged cases as to the rights of mortgagor and mortgagee, both before and after condition broken, arising from the different views taken of mortgages at law and equity, and the more or less extended application of equitable doctrines to contracts of this description in Courts of Law. In England, a mortgage is regarded in law as a conveyance, vesting in the mortgagee, upon its execution, a conditional estate, which becomes absolute upon breach of its condition, and of course carrying with it all the rights and incidents belonging to the ownership of property. Thus, the mortgagee, unless restrained by stipulations in the mortgage, is there entitled to immediate possession of the land, and may enter peaceably, or bring ejectment; and his right to possession can not be defeated, except by payment at the period fixed by the terms of the mortgage. Payment, subsequent to that period, only gives an equity of redemption, and a re-conveyance is necessary to vest the title in the mortgagor. (Coote on Mort., 339; Greenleaf's Cruise, 2 vol., 91.) The same doctrine prevails in several of the States. Thus, in Doe *v.* Grimes, (7 Black., 1,) the Supreme Court of Indiana held that an action of ejectment would lie by the mortgagee against the mortgagor, before default. "The law, we think," said Sullivan, J., "is well settled that the mortgagee, by virtue of his mortgage, becomes the legal owner of the premises, and is consequently entitled at law to the immediate possession, unless there be an agreement between the parties, expressed in the contract, or plainly inferrible from it, that the mortgagor shall remain in possession." (Blaney *v.* Bearce, 2 Greenl., 137; Newall *v.* Wright, 3 Mass., 139; Coleman *v.* Packard, 16 Mass., 39.)

But in equity, both in England and the United States, a mortgage is regarded in a very different light. The settled doctrine of equity is, that a mortgage is a mere security for a debt, and passes only a chattel interest; that the debt is the principal, and the land the incident; that the mortgage constitutes simply a lien or incumbrance, and that the equity of redemption is the real and beneficial estate in the land which may be sold and conveyed by the mortgagor, in any of the ordinary modes of assurance, subject only to the lien of the mortgage. This equitable doctrine, established to prevent the hardships springing by the

rules of law from a failure in the strict performance of the condi-
tions attached to the conveyance, and to give effect to the just
intent of the parties in contracts of this description, has been, in
most of the States, gradually adopted by the Courts of Law, al-
though in some instances to a limited extent only (4 Kent, 160.)
The cases indicate a fluctuation between equitable and common
law views of the subject; and a hesitation by the Courts of Law
to carry the equitable doctrine to its legitimate results. (Gray
v. Jenks, 3 Mason, 521.)

"Unless the different purposes of a mortgage are adverted to,"
observes Parker, C. J., in Smith v. More, (11 N. H., 59,) "there
would appear to be much confusion in the books relative to the
rights of the mortgagor and mortgagee; and with those pur-
poses in view, an attempt to reconcile them would be made in
vain."

The law concerning estates in dower, referred to by the de-
fendants' counsel, furnishes an illustration of the change which
the original character of mortgages has undergone. To entitle
a widow to dower, the seizin of the husband must have been
more than an equitable seizin; it must have been a legal seizin
of the estate of inheritance. In the case of Steele v. Carrol, (12
Peters, 204,) Taney, C. J., said "that, according to the princi-
ples of the common law, a widow is not dowable in her husband's
equity of redemption; and if a man mortgages in fee before mar-
riage, and dies without redeeming the mortgage, his widow is
not entitled to dower." But in the case of Collins v. Torry (7
John., 277), it was adjudged that the estate of the mortgagor is
the real estate at law, and that the widow of the mortgagor may
recover her dower out of the land mortgaged, the Court saying:
"We have in this State (New York) gone greater lengths than
the precedents in the English books towards a recognition of the
mortgagor's estate at law."

In Runyan v. Mersereau, (11 John., 538,) which was an action
of trespass, the question presented was, whether the freehold was
in the plaintiff, who had purchased the equity of redemption
under a judgment against the mortgagor, or in the defendant,
the mortgagee, whose mortgage was prior to the judgment; and
the Court held the freehold to be in the plaintiff, and said:
"Mortgages are not considered as conveyances of land, within
the Statute of Frauds, and the forgiving the debt, with the deliv-
ery of the security, is holden to be an extinguishment of the
mortgage."

In Jackson v. Bronson, (19 John., 325,) the mortgagor sustained
ejectment against the grantee of the mortgagee, and the Court
said: "It is now well settled, that the mortgagee has a mere
chattel interest, and the mortgagor is considered as the proprie-
tor of the freehold. The mortgage is deemed a mere incident to
the bond, or personal security for the debt, and the assignment

of the interest of the mortgagee in the land, without an assignment of the debt, is considered in law as a nullity."

In Gardner v. Heartt, (3 Denio, 234,) Beardsley, J., says : " A mortgage creates a specific lien on the land mortgaged, as a judgment duly docketed does a general one on the land of the judgment-debtor. But the mortgagee, as such, has no title to the land mortgaged ; he has neither *jus in re* nor *ad rem*, but a mere security for his debt; title to the land, notwithstanding the mortgage, remaining in the mortgagor."

In Waring v. Smith (2 Barb. Ch. Rep., 135,) Chancellor Walworth said : " Before the adoption of the revised statutes, it was settled by the Courts of this State, that the mortgagor was to be considered as the real owner of the fee, of the lands mortgaged, except for the mere purpose of protecting the mortgagee as the holder of a security thereon for the payment of his debt. And the revised statutes have restricted the legal rights of the mortgagee still further, by depriving him of the power to bring a suit to recover the possession of the mortgaged premises before a foreclosure. The only right he now has, in the land itself, is to take possession thereof, with the assent of the mortgagor, after the debt has become due and payable, and to retain such possession until the debt is paid. The mortgage, then, is here nothing but a chose in action, or a mere lien or security upon the mortgaged premises, as an incident to the debt itself." The cases cited above, from Johnson's Reports, were decided several years previous to the adoption of the revised statutes referred to by the Chancellor. A provision, more extensive in effect than the New York statute, is embodied in our Practice Act. Section 260 reads as follows : " A mortgage of real property shall not be deemed a conveyance, whatever its terms, so as to enable the owner of the mortgage to recover possession of the real property without a foreclosure and sale." This section takes from the instrument its common law character, and restricts it to the purposes of security. It does not, it is true, in terms, change the estates at law of the mortgagor and mortgagee, but, by disabling the owner from entering for condition broken, and restricting his remedy to a foreclosure and sale, it gives full effect to the equitable doctrine, upon a consideration of which the section was evidently drawn. An instrument which confers no right of either present or future possession, possesses little of the character of a conveyance, and can hardly be deemed to pass any estate in the land.

The just and liberal doctrines of equity respecting mortgages have been adopted in this State, and asserted, either directly or indirectly, in repeated instances, by this Court. In Godeffroy v. Caldwell, ( 2 Cal., 493,) it was said that " mortgages at the present day are considered as merely securities for the payment of

money, and no breach of their conditions can possibly vest the title in the mortgagee."

In Peters *v.* Jamestown Bridge Company, (5 Cal., 336,) the mortgagee, Perry, had conveyed the property to one person, and assigned the mortgage to another. The plaintiff was the grantee of the property, and the defendants were assignees of the mortgage. The defendants commenced an action to foreclose the mortgage, and obtained a decree, and were proceeding to sell the property when the plaintiff brought suit, enjoining them from further proceedings, on the ground that the sale would create a cloud upon his title. The Court below decreed a perpetual injunction, and upon appeal to this Court, the decree was reversed; and Heydenfeldt, J., said: "The deed from Perry to plaintiff could not operate as an assignment of the mortgage. The latter is a mere security for the debt, and cannot pass without a transfer of the debt; so it would seem that the two transactions are totally different in character; the intent of the one is to convey the title to land; of the other, to transfer a debt with its security. If a contrary doctrine was maintained, it would produce the evil (as in this case) of enabling a net to be thrown for the entrapment of the innocent."

In Bennett *v.* Taylor et al., (5 Cal., 502,) the facts are not stated, but it would appear from the opinion that exception had been taken to the introduction in evidence of a mortgage, without first producing or accounting for the note to secure which it was given, and Murray, C. J., said: "The mortgage was a mere incident to the debt, and in order to maintain the action, which was founded on the plaintiffs' possession and the mortgage, the debt should have been proved."

In Ord *v.* McKee, (5 Cal., 515,) the Court said: "A mortgage is a mere incident to the debt which it secures, and follows the transfer of the note with the full effect of a regular assignment. Ord, having the right to the note, had undoubtedly a right to foreclose the mortgage."

In Guy *v.* Ide, (6 Cal., 99,) the plaintiff had obtained an order appointing a receiver of the rents and profits of the mortgaged premises, pending a suit to foreclose the mortgage. On appeal, this Court, per Terry, J., said: "Our statute forbids a mortgagee from recovering the mortgaged estate, and confines his remedy to a foreclosure. The same reason does not, therefore, exist, as by the English rule, for appointing a receiver to collect the rents and profits, pending the litigation. The mortgage is considered as only the security for the debt; the estate remains that of the mortgagor, in the character of owner, and must continue to remain so, with all the incidents of ownership, until, by a foreclosure and sale, a new owner is substituted."

In Phelan *v.* Olney, (6 Cal., 478,) the doctrine of Ord *v.* McKee, and Bennett *v.* Taylor, was affirmed. In Belloc *v.* Rogers, (9

Cal. Reports,) Burnett, J., said, *arguendo*: "At common law, a mortgage vested the legal title in the mortgagee, subject to be defeated by the performance of the condition subsequent. But this theory is entirely changed by our system, and the legal title remains with the mortgagor, subject to be divested by a foreclosure and sale."

The decisions of this Court, from which the above citations are taken, were made, with one exception, in equity cases; but the language of the Court does not appear, in any instance, to have been governed by a consideration of the tribunal in which the remedy was sought, but entirely from a consideration of the nature of the contract.

The mortgage being a mere security for a debt, it must follow that the payment of the debt, whether before or after default, will operate as an extinguishment of the mortgage. Indeed, in those Courts, with some few exceptions, where the common law view of mortgages is the most strictly adhered to, payment of the debt is held to re-vest the estate without a re-conveyance in the mortgagor, though it is difficult to see upon what principle. If the mortgage is a conveyance after default, it must be equally so before; the only difference being that, in the one case, the estate conveyed is conditional, and in the other absolute. If, after default, the estate be absolute, it is not easy to perceive how the grantee can be divested without deed under the Statute of Frauds; and yet, according to the general doctrine of the modern cases, payment has that effect. This is one of the inconsistencies arising from a partial adoption of the equitable doctrines by the Courts of Law.

In truth, the original character of mortgages has undergone a change. They have ceased to be conveyances, except in form. They are no longer understood as contracts of purchase and sale between the parties, but as transactions by which a loan is made on the one side, and security for its repayment furnished on the other. They pass no estate in the land, but are mere securities, and default in the payment of the money secured does not change their character.

Proceedings for the foreclosure of mortgages, in the sense in which the terms are used in England, and in several of the States, by which the mortgagor, after default, is called upon to repay the loan by a specified day, or be forever barred of his equity of redemption, are unknown to our law. The owner of the mortgage in this State can in no case become the owner of the mortgaged premises, except by purchase upon sale under judicial decree consummated by conveyance. A foreclosure-suit, by our law, results only in a legal ascertainment of the amount due, and a decree directing the sale of the premises, for its satisfaction, the surplus, if any, going to subsequent incumbrancers or the owner of the premises, and execution following for any

deficiency. And by the decision of this Court, in Kent & Cahoon v. Laffan, (2 Cal., 595,) the statutory right of redemption is held equally applicable to sales under decrees in mortgage cases, as to sales under ordinary judgments at law. Whether this decision would be now made, were the question an open one, it is unnecessary to determine. It has been repeatedly recognized as law by this Court, (Harlan v. Smith, 6 Cal., 173,) and has been acted upon by parties for years; rights of property have been acquired under it, which we are not at liberty at this day to disturb. By this decision, the estate of the mortgagor and of the judgment-debtor after sale, stand upon the same footing, and the insertion in the decree of a clause foreclosing the equity of redemption is a useless formula, which cannot enlarge the effect of the decree, or any rights of the mortgagee under it. The decisions as to the estate of the judgment-debtor, after sale, become, therefore, authorities for determining the estate of the mortgagor after sale under decree; and from them it will be found that the estate must remain in the mortgagor until a consummation of the sale by conveyance, as it does in the judgment-debtor, and that the conveyance, when executed, will take effect, in the one case, from the date of the mortgage, as it does in the other from the time the lien of the judgment attached.

By a statute of New York, passed in 1820, any creditor was entitled to redeem premises sold under execution, if he had a lien upon them by a decree in chancery or judgment at law, rendered before the expiration of fifteen months from the date of the sale. Under this act the question was raised in the Courts of that State as to the estate of the purchaser previous to the execution of the conveyance, and as to the effect, as liens, of decrees and judgments recovered after the sale; and it was held that until the deed was executed, the purchaser had a lien only on the land, (Bissel v. Payne, 20 John., 3;) that the estate of the debtor was not changed by the sale and certificate of the sheriff, and the purchaser acquired no title until the conveyance was executed, (Van Rensselaer v. Sheriff of Albany, 1 Cowen, 511;) that the existence of the judgment at the time of the sale was not essential to the lien; that it became a lien, if recovered within the fifteen months after sale. (Van Rensselaer v. Sheriff of Onondaga, 1 Cowen, 443,) even though the judgment were confessed for the express purpose of enabling the creditor to redeem. (Snyder v. Warren, 2 Cowen, 518.)

There is no difference, so far as the liens of the judgments are concerned, between our statute and that of New York. Here the statute requires the lien by the judgment of the creditor to be *subsequent* to that on which the property is sold; there the statute requires the judgment which creates the lien to be recovered *before* the expiration of the time of the redemption. The period within which the judgment creating the lien must be recov-

ered is not limited in either case by the sale; and in Kent & Cahoon v. Laffan, the judgment under which a redemption was claimed was recovered after the sale of the premises under the decree of foreclosure, although this fact does not appear in the report of the case.

It follows, from the views above expressed, that the legal title of the premises remained in Randall after the sale, under the decree of foreclosure, and that the plaintiff acquired a lien by his judgments; the lien of the first judgment attaching on the 7th of February, 1855, and of the second on the 21st of July of the same year. The lien of this last judgment was extinguished by the sale under the Smith judgment, made on the 12th of March, 1855, followed by a conveyance from the sheriff, which, by relation, took effect on the 20th of February, 1855, when the judgment became a lien. The second judgment of the plaintiff could not, therefore, be available as a basis of redemption on the 13th of December, 1856; and the right of the plaintiff to redeem, as a creditor, must rest upon the first judgment. Upon this judgment, execution had been issued, and the premises sold to the plaintiff on the 17th of March, 1856, for two thousand dollars; and it is objected by the defendants that this sale extinguished the lien of the judgment for the residue.

The question raised by this objection is not a new one. It was before the Court, in Vandyke v. Harman, in 1853. (3 Cal., 296.) In that case, the plaintiff was the holder of a mortgage to secure a note of $1,500, and obtained judgment for the amount, and a decree for the sale of the mortgaged premises. At the sale he became the purchaser for $1,000. The respondents, who were creditors of the mortgagor, having a lien upon the premises, paid to the sheriff the amount bid by the plaintiff, with eighteen per cent. thereon, and interest to the date of the redemption, and claimed a deed. This the sheriff refused to execute, and the respondents applied to the Court below, and obtained a mandamus to compel its execution. On appeal, the judgment was reversed, and the Court, per Heydenfeldt, J., said: "The sum paid to the sheriff to redeem the land, was insufficient for that object. The whole amount of Vandyke's judgment, with interest, should have been paid. The language of the statute is explicit. If the interpretation insisted upon by the respondents be correct, that by the purchase of the property the lien of the creditor purchasing is gone, even for the purpose of redemption, then the statute would have no meaning whatever."

The same question was before this Court for consideration in Knight v. Fair, (9 Cal.) and the decision in Vandyke v. Harman was affirmed. In Knight v. Fair, the plaintiff was the owner of a judgment, and the purchaser of the real property sold. The successor in interest paid to the purchaser an amount greater than his bid, but less than the amount due on

27

the judgment, and the payment was held insufficient for a redemption. In the opinion in the case, Burnett, J., said: "The two hundred and thirty-first section of the Code allows the judgment-debtor, or a redemptioner, to redeem within six months after the sale, by paying the purchaser the amount of his purchase, with eighteen per cent. thereon, in addition, together with any assessments or taxes, and interest on such amount; and if the purchaser be also a creditor, having a lien prior to that of the redemptioner, the amount of such lien, with interest."

"It is certain, from this explicit language, that the *purchaser* may have a *lien* upon the property *prior* to that of the redemptioner. The fact that he is the *creditor* does not divest his lien. He may be both a creditor and a purchaser, and still have a *prior* lien to that of the redemptioner. This can only be upon the principle, that the legal estate is still in the judgment-debtor until the delivery of the sheriff's deed; and, if in the debtor, it is such an estate as may be the subject of a lien, a sale under execution, or of a conveyance by deed from the debtor. * * *. We are compelled to give the statute this construction. If we do not, it has no meaning."

The cases cited by the counsel of the defendants from the New York Reports, are not in conflict with the decisions of this Court. In Hewson *v.* Deygert, (8 John., 333,) the purchaser was not the owner of the judgment. The premises were bid in by a third party. In such case, the purchaser must take the property discharged of the lien of the judgment, otherwise no one would be safe in purchasing at a sheriff's sale for a sum less than the full amount of the judgment, as the property in his hands would be subject to re-sale, as often as any balance remained unsatisfied. This is a very different question from the one involved in Vandyke *v.* Harman, and in Knight *v.* Fair, where the owner of the judgment became the purchaser. Besides, the only point decided in Hewson *v.* Deygert was, that the Court would not interfere, in a summary way, by rule, to stay a second sale of the premises under the same judgment, the party with the title having a remedy by action in case of injury; and as to the effect of the sale in discharging the lien on the judgment, the Court states expressly that it only *intimates* its impression, and gives "*no decided opinion.*"

In 1820, the Legislature of New York provided, in the statute which authorizes redemptions, that "the plaintiff, under whose execution any real estate shall have been sold, shall not be authorized to acquire the title of the original purchaser, or of any creditor to the premises so sold, by virtue of the decree or judgment on which such execution issued," (2 R. S., 373, § 58,) and the decisions cited from Cowen and Wendell were made years afterwards. In Ex parte Stevens, (4 Cowen, 133,) the owner of the judgment was not the purchaser, and the decision was made

in view of the provision of the statute, as is evident from the syllabus of the reporter. In People v. Easton, (2 Wend., 297,) the sale under the execution was made for a sum exceeding the judgment, which was thus satisfied. The owner was, of course, no longer a creditor having a lien.

It is further insisted by the counsel of the defendants, that the time of redemption, under the sale upon the judgment of the plaintiff, having expired on the 17th of September, 1856, Randall became thereby divested of all interest in the premises, and there remained no interest in him on the 13th of December, upon which the judgment could subsist as a lien. The answer to this is, that the title remained in the debtor until conveyance executed. Until then, the purchaser had no legal estate in the premises, but only a right to an estate which might be perfected by conveyance. This point was expressly decided in Smith v. Colvin, (17 Barb., 161.) That was an action of ejectment, and it was objected to the plaintiff's recovery that his legal estate had become divested by a sale on execution and the expiration of the time of redemption before trial, and the Court said : " This ground is untenable, because the sale had not been consummated by sheriff's conveyance. * * The title does not pass by filing the sheriff's certificate, which only operates as a lien by way of action to protect the purchaser against intervening claims, except the right of redemption. Nor does the estate of the debtor become vested in the purchaser by mere lapse of the time of redemption, but only, as we think, by the sheriff's conveyance under the statute." (Vaughn v. Ely, 4 Barb., 159.)

The case of Wright v. Douglass, (2 Comstock, 373,) does not, when properly considered, conflict with Smith v. Colvin. The decision in that case was based upon the effect, under the statute of New York, of an attachment upon the equitable interest of the debtor in land.

The objection of the defendant goes to the capacity in which the plaintiff undertook to redeem, and not to his right of redemption. If the lien of the judgment was extinguished by the lapse of the time of redemption, then the plaintiff was the successor in interest of Randall, and as such, was equally entitled to redeem.

We do not perceive the force of the objection, that the operative effect of payment, as a redemption, is to be determined by the capacity in which a party entitled to redeem presents himself before the officer. It can make no difference to the purchaser, whether the money is paid by the plaintiff as successor in interest, or as creditor having a lien.

The next question for consideration is, whether the payment of $24,146 08, made on the thirteenth of December, 1856, operated as a redemption of the premises. The circumstances occurring at the time are detailed in the testimony of the sheriff, set forth in the findings of the Court. From this it appears that

on the evening previous, the plaintiff, by his counsel, informed the sheriff of his intention to redeem the premises, and requested the officer to make out a statement of the amount necessary to be paid for the redemption.   To this the officer, after some objection, assented, and on the following day made out the amount at $24,146 08.   What then took place is thus stated by the officer : " Mr. Shafter said that was too much ; that the amount required would not amount to seventeen thousand dollars, but he would pay whatever sum I demanded, and insisted I should name the amount.   *He paid me the amount, twenty-four thousand one hundred and forty-six dollars and eight cents;* he protested against paying the amount ; said it was too much ; it was, at the same time, in the office ; he requested me to give a statement of the items, as I figured it up ; there was a written protest served at the time Shafter asked me for the certificate ; I think he prepared the certificate ; I signed it ; Shafter told me probably that was not the end of the matter, and requested me to deposit in Garrison & Co.'s, to save the interest during the litigation. About one week after, I deposited a portion with Tallant & Wilde, and a portion with Parrott & Co.   *   *   *I mean by protest, only that he said the sum was too much.*   The written protest was after I had counted the money, and found it correct.   I read the certificate, and signed it ; can't say whether certificate was executed before protest or after.   *   *   I knew it to be correct. I selected my own bankers ; Shafter advised me as to Parrott. *There was no arrangement about the money.*   Shafter said a portion of the money was borrowed of Garrison & Co."

The written notice of protest, referred to in the testimony of the sheriff, specified the items to which objection was made. *After* the payment, as described above, and at the same interview, the plaintiff requested the sheriff to deposit the money with Messrs. Garrison & Co., bankers, San Francisco, assigning as a reason that a part of the same had been loaned by them at two per cent. per month, and would probably be tied up by litigation for several months, and by such deposit the interest could be provided for.   On the twentieth of December, the sheriff proceeded to San Francisco, from Marin county, and deposited a portion of the money with Tallant & Wilde, and a portion with Parrott & Co., receiving certificates of deposit for the same. Whilst the sheriff was in San Francisco, the plaintiff commenced a suit against him for the recovery of ten thousand dollars, as for money had and received to his use, and issued an attachment, and, according to the statement of the Court in its finding, " caused the money so deposited to be attached in the hands of the bankers to satisfy any judgment which he might recover in the action," and which " money remained so attached at the commencement and trial " of the ejectment-suit.   Afterwards, on the seventeenth of February, 1857, the plaintiff filed a bill in

equity, upon which an injunction was issued and served, restraining the bankers from using or paying out the moneys deposited, and the sheriff from negotiating the certificates of deposit. In the bill, which was duly verified, the plaintiff alleged that the sum of $6,700, left with the sheriff, was not due and payable as a portion necessary for the redemption, and that the sheriff had no right to the same. The suit in equity was undetermined, and the injunction in force at the commencement and trial of the ejectment case.

Upon these facts, the defendants contend that no redemption was made, and this involves the consideration of the effect of the protest upon the payment; the effect of the attachment upon it; and the effect of the injunction.

The object of a protest is to take from the payment its voluntary character, and thus conserve to the party a right of action to recover back the money. It is available only in cases of payment under duress or coercion, or when undue advantage is taken of the party's situation. It has no application to voluntary payments. It does not create a lien upon the money paid, or any legal impediment to its control. It does not impair, in any respect, the operative effect of the payment as a discharge of the demand upon which it is made, so far as such demand is legal. It is notice, only, to the party receiving the payment, that, if the demand is illegal in whole, or in any specified particulars, he may be subjected to an action for the recovery back of the amount to which objection is made; and if action be brought, the protest is only available as evidence of the fact of compulsion.

In Fleetwood v. The City of New York, Sandford, J., said: "The legal effect of the payment is not impaired by the protests made. When a party pays under duress of his goods, a protest may become important as evidence that the payment was the effect of the duress, and not an admission of the right enforced by the adverse party. But where there is no legal compulsion, a party yielding to the assertion of an adverse claim, cannot detract from the force of his concession by saying I object, or I protest, at the same time that he actually pays the claim. The payment nullifies the protest as effectually as it obviates the previous denial and contestion of the claim." (See, also, Chase v. Dwinall, 7 Greenl'f, 134; Clinton v. Strong, 9 John., 370.)

It is unnecessary to decide whether the protest in the present case can be available for any purpose. It is of no consequence whether the payment was voluntary or otherwise. It was absolute, untrammeled by conditions. "There was no arrangement," testifies the sheriff, "about the money." Complaints of the amount required, objections in the words "I protest," whether made orally or in writing, were not clogs upon the absolute dominion of the officer over the money. He could have paid the same to the purchaser immediately, or on the following day, or

at any time during the week. He received the money on the 13th, and no proceedings were taken against him for the alleged excess until the 20th.

The attachment could not impair the legal effect of the judgment. It was not a recaption of the money; nor even a lien upon it. It is true, the Court finds that the plaintiff caused the money in the hands of the bankers to be attached, and that the attachment remained upon it at the trial of the ejectment-suit; but this finding is inconsistent with, and negatived by, the previous finding that the bankers had already issued certificates of deposit to the sheriff for the money. These certificates are presumed to be in the ordinary form; it is not found that they were special and restricted in their character; they were then negotiable instruments under the statute, according to the decision of this Court in Welton v. Adams & Co., (4 Cal. R., 27; Compiled Laws, 146.)

The bankers, by the certificates, became liable, not to refund to the sheriff the specific money deposited, but to pay its amount to the holder of the certificates, on their presentation. After their issuance, there was nothing in the possession of the bankers belonging to the sheriff upon which an attachment could fasten. There remained merely an obligation to pay the holder of the certificates, whoever he might be. (Sheets v. Culver, 14 La., 449; Kimbal v. Plant, Ibid., 511.) Whether the certificates could have been reached by any proceedings under attachment whilst in the hands of the officer, it is unnecessary to determine. No such proceedings were taken, and it is sufficient that the money deposited could not have been affected by the attachment. In the argument of counsel, the character of the suit seems to have been lost sight of. The suit is not based upon any supposed present interest of the plaintiff in the specific money paid on redemption; it involves no assertion of title, but proceeds upon the relation of creditor and debtor. The complaint in the action alleges an indebtedness, and the words " had and received to the plaintiff's use," are put as the consideration upon which to support the *assumpsit* on the part of the defendant. Where money is paid upon compulsion, the law raises an obligation to refund, and the form of the action is for money had and received to the plaintiff's use. The argument attempted to be drawn from the technical language to qualify the payment, is based upon a misconception of the nature of the action, and the character of the pleadings in it.

The bill upon which the injunction was issued, alleges the facts in relation to the redemption of the premises, and the subsequent deposit of the money with bankers in San Francisco, and the issuance of certificates by them, and as distinct grounds of the equity jurisdiction avers the irresponsibility of the sheriff and his sureties, and sets forth the various pretences of Hyatt, that the re-

demption was imperfect and abortive; that the judgment under which it was made was fraudulent and void; that the amount paid was insufficient for redemption, or ineffectual, by reason of the protest, all of which pretences, it says, are false in fact; and further avers that Hyatt has induced the sheriff, by giving a bond of indemnity, to execute to him a deed of the premises, and yet insists that in case the redemption should prove effectual, he will be entitled to the sum of $24,146 08. The bill concludes with a prayer for the injunction above mentioned, and that a receiver be appointed to take the custody of the certificates, and to hold the same for the purposes of the suit, and to invest the funds at interest, pending the litigation; that an account of the money paid under protest, be taken, and that the excess, above the amount essential to effect a redemption, be decreed to be paid to the plaintiff, and in the event the Court should adjudge, for any reason, the redemption to be inoperative, then that the whole sum be decreed to the plaintiff; but in the event the redemption should be adjudged valid, then that so much of the amount as was essential for the redemption, be paid to the parties entitled thereto.

To the bill the defendants demurred; some of them on the ground that it did not show any redemption by the plaintiff; and the others, on the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was sustained on this last ground; and the bill dismissed.

The facts stated in the bill do not constitue a case for the cognizance of a Court of Equity. It does not present a case of trust. If the redemption was invalid, the plaintiff is entitled to the whole of the money; but if valid, and there was any excess in the payment, he is entitled to such excess, assuming (for we do not attempt to decide the question) that the payment of such excess was by compulsion. In either case, the remedy at law is ample. Whatever hypothesis is taken, the sheriff can only be a debtor, either for the whole amount, or for the excess, and his insolvency is no ground for the interference of a Court of Equity. The demurrer was, therefore, well taken.

As there was no ground for the equity-suit, it can have no effect upon the validity of a transaction which was closed on the thirteenth of December previous, except as evidence of the intent of the parties at the time. And, neither from the language, or scope and purpose of the bill, can any inference be drawn against the absolute and unconditional character of the payment. It contains not a word which can be tortured into an admission against the claim of the plaintiff. That the parties entitled to the money may have been injured by the injunction, is possible; but they have their remedy on the injunction-bond. In Ex parte Newall, (4 Hill, 589) the creditor paid, unconditionally, to the sheriff the requisite amount for redemption, and immediately

thereafter served an injunction in his own favor, restraining the sheriff from paying it over, and it was held, nevertheless, that he was entitled to the sheriff's deed. The bill in that case was filed, and the injunction obtained in advance, forbidding the sheriff from paying over the money, which the creditor might pay to effect the redemption, until the further order of the Court of Chancery, and it was objected that, in consequence of the service of the injunction there was no redemption; but the Court, by Bronson, J., said: "Whether the injunction was properly issued or not, is a question for the Court of Chancery. Asssuming that it was regular, and that the money is stayed in the hands of the sheriff, we are still of opinion that there was a good redemption by Addington. He made an unconditional payment of the amount of the bank-judgment, and the sheriff received and receipted the money before the injunction was served. The redemption was then complete, and subsequent service of process to stay the money in the hands of the sheriff, could not undo what had already been well done. It is not like the case of a tender, trammeled with conditions, or an offer of payment without parting with the money.

This authority is conclusive on the point in the case at bar. After a careful consideration of the objections of the learned counsel of the defendants, we are of opinion that the redemption of the thirteenth of December, 1856, was complete; and the subsequent attachment and injunction-suits could not undo what was then well done.

In the *mandamus* case there is the further objection raised by the defendants, not involved in the determination of the other cases—that the proceedings were taken in the wrong county. The deed of the twenty-sixth of December was executed to the plaintiff in his capacity as purchaser. Sixty days having elapsed from the time of his redemption from the sale under the decree of foreclosure, he became entitled to a further deed as redemptioner, under section two hundred and thirty-two of the Practice Act, and the proceedings were taken in the District Court of San Francisco, to compel the execution of the deed.

The county where a cause is to be heard is to be determined, with some specified exceptions, by the residence of the parties. The general rule under the statute in force at the time these proceedings were instituted, is contained in section twentieth of the Practice Act, which provides that the action shall be tried in the county in which the parties, or some of them, reside at its commencement. This case is not embraced by any of the exceptions, and, therefore, falls within the general rule. The second subdivision of section nineteenth, which provides that actions against a public officer for *acts done* by him in virtue of his office, shall be tried in the county where the cause or some part thereof arose, applies only to affirmative acts of the officer,

by which, in the execution of process, or otherwise, he interferes with the property or rights of third persons, and not to mere omissions or neglect of official duty. (Elliott v. Cronks, Adm., 13 Wend., 35; Hopkins v. Heywood, Ib., 265.) Nor does the proceeding involve the determination of a right or interest in real estate. The relator claims only an official document, the possession of which will enable him to assert any rights he may have acquired. The awarding of the *mandamus* cannot determine these rights, or in any respect affect the interests of third parties. The objection, therefore, to the county, is untenable.

It follows, from the views we have taken of these cases, that the judgment in the ejectment case must be reversed, and the judgments in the other two cases affirmed. In the ejectment case, all the facts are found by the Court below; and it is the settled practice of this Court, since the decision of Holland v. The City of San Francisco, to direct in such cases upon a reversal, the entry of the judgment warranted by the facts found. In McMillan v. Richards et al., therefore, the judgment is reversed, with directions to the Court below to enter judgment in favor of the plaintiff for the possession of the premises described in the complaint, and the recovery of the damages assessed, for their use and occupation. In the other two cases the judgment is affirmed.